**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| YELENA SAVINOVA, *et. al.*,<br><br>*individually and on behalf of all others similarly situated,*<br><br>   Plaintiffs,<br><br>v.<br><br>NOVA HOME CARE, LLC, *et. al.*,<br><br>   Defendants. | Case No. 3:20-cv-01612-MPS |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR PROTECTIVE ORDER AND OTHER RELIEF

### I. INTRODUCTION

The plaintiffs, Yelena Savinova and Yemiliya Mazur (collectively, "Plaintiffs"), move this Court for a protective order, corrective notice, and invalidation of releases and/or declarations obtained by Defendants from current employees of Nova Home Care, LLC ("Nova") and Southern Home Care Services, Inc. ("Southern"). This week, it has come to the attention of Plaintiffs' counsel that Defendants have been making unprecedented one-time payments to current employees of Nova and Southern, bringing the workers to individual meetings with Defendants at the Marriott Hotel in Stamford, CT, and asking them to sign documents stating that they do not have claims against Defendants.

Defendants' actions are highly coercive. They interfere with the class and collective action process and warrant immediate intervention by the Court. First, the circumstances of Defendants' meetings with current employees, with workers being picked up from their work

1

assignments during working hours and driven to a hotel to meet with the Defendants, are rife with potential for coercion. These workers have little choice in declining to attend the meetings for fear of losing their jobs. The presence of Defendants' lawyers at these meetings makes them all the more intimidating and coercive. Defendants have asked workers to sign documents stating they do not have claims against Defendants. Coupled with the unprecedented bonus payments, the Defendants' communications have a high potential for coercion and are intended to reduce the size of the proposed class and collective in this case by obtaining releases from current workers and/or otherwise discouraging their participation in this action.

In light of Defendants' highly improper, coercive communications with potential class and collective members, Plaintiffs respectfully request that the Court, pursuant to its inherent authority to manage collective actions: (1) issue a protective order barring Defendants from non-routine *ex parte* communications with class members; (2) order Defendants to produce any documents they asked workers to sign at the meetings; (3) order Defendants to provide a list of class members they met with; (4) order that a corrective notice be issued to all class members regarding their rights in this case; (5) order that any declarations or releases obtained by Defendants are invalid; and (6) order any other relief the Court deems appropriate.

## II.  FACTUAL BACKGROUND

Plaintiffs Yelena Savinova and Yemilia Mazur worked for Defendants Nova and Southern as live-in caregivers. ECF Nos. 22-2, 22-3. Nova is owned and managed by defendant Aleh Huliavatsenka and Southern's Connecticut operations are managed by his life partner, Yuliya Novikava. Id. Plaintiff Savinova and many class members often performed work for both companies interchangeably. Id. Plaintiffs and many other caregivers employed by Nova and Southern are recent immigrants from Russia, Ukraine, and other former Soviet republics who

speak little or no English. Id. They stay at the homes of the clients they are assigned to, often for weeks at a time without a break. Id. They attend to sick, elderly clients around the clock but are only paid for a set number of hours, usually between 13 and 16 hours per day. Id.

Plaintiffs filed this case on October 27, 2020, alleging that they and other live-in caregivers working for Nova and Southern did not receive minimum wage and overtime compensation as required by the FLSA and the Connecticut Minimum Wage Act. ECF No. 1. On February 19, 2021, Plaintiffs filed a Motion for Conditional Certification, asking this Court to issue notice of this case to all individuals who worked for Nova and/or Southern Home Care during the past three years. ECF No. 22.  Defendants have filed motions to extend the briefing schedule on Plaintiffs' conditional certification motion. ECF Nos. 24, 27.  Plaintiffs have opposed these motions as delay tactics. ECF No. 25.

This week, Plaintiffs' Counsel learned from several current and former employees of Nova and Southern that, over the past few weeks, Defendants have picked up employees from their assignments during working hours and driven them to the Marriott Hotel in Stamford. Declaration of Mariusz Kurzyna ("Kurzyna Decl."), ¶ 3; Declaration of Lyudmyla Chumakova ("Chumakova Decl."), ¶¶ 5-6. There, Defendants met with the workers and asked them to sign documents stating that they did not have claims against Defendants. Id. Counsel for both Defendants were present for at least some of these meetings. Chumakova Decl., ¶ 6.  Several individuals also reported receiving one-time bonus payments, unlike any payment they had received from Defendants before. Kurzyna Decl., ¶ 2; Chumakova Decl., ¶¶ 2-4.

### III. ARGUMENT

#### A. This Court has the Inherent Authority to Manage Communications with Class and Collective Action Members

"Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981).[1] "Courts applying the Gulf Oil standard have found that *ex parte* communications soliciting opt-outs, or even simply discouraging participation in a case, undermine the purposes of Rule 23 and require curative action by the court." Guifu Li v. A Perfect Day Fran., Inc., 270 F.R.D. 509, 517 (N.D. Cal. 2010). "Examples of communications that may warrant restraint include efforts by a defendant to encourage potential class members not to participate in the class action, thereby reducing potential liability." County of Santa Clara v. Astra USA, Inc., 2010 WL 2724512, at *3 (N.D. Cal. July 8, 2010) (citing Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1201–03 (11th Cir. 1985)).

Similarly, the FLSA's collective action mechanism gives this Court broad power to oversee and regulate communications with collective action members. See Hoffmann–LaRoche v. Sperling, 493 U.S. 165, 170–71 (1989). "The overarching policies of the FLSA's collective suit provisions require that the proposed notice [to collective action members] provide accurate and timely notice concerning the pendency of the collective action, so that [putative collective

---

[1] This authority applies at all stages of a class action proceeding. See, e.g., Keystone Tobacco Co., Inc v. U.S. Tobacco Co., 238 F.Supp.2d 151, 154 (D.D.C. 2002) ("[T]he Court rejects defendants' position that it has no authority to limit communications between litigants and putative class members prior to class certification."); Ralph Oldsmobile Inc. v. Gen. Motors Corp., 2001 WL 1035132, at *2 (S.D.N.Y. Sept.7, 2001) ("[A] court's power to restrict communications between parties and potential class members [ ] appl[ies] even before a class is certified."); Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ., 115 F.R.D. 506, 512 (E.D. Pa. 1987) (discussing a court's curative powers after "parties initiate improper communications with class members").

4

action members] can make informed decisions about whether to participate." Whitehorn v. Wolfgang's Steakhouse, Inc., 767 F.Supp.2d 445, 450 (S.D.N.Y. 2011); see also Billingsley v. Citi Trends, Inc., 560 Fed. Appx. 914, 924 (11th Cir. 2014) (unpublished) ("Because FLSA plaintiffs must opt-in, unsupervised, unilateral communications with those potential plaintiffs can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.'"). "District courts can exercise their discretionary authority over the notice-giving process in collective actions to 'prevent confusion and unfairness by prohibiting and correcting communication that is inaccurate, unbalanced, misleading, or coercive, or which improperly attempts to encourage class members not to join the suit.'" OConner v. Agilant Sols., Inc., 444 F. Supp. 3d 593, 601 (S.D.N.Y. 2020) (quoting Agerbrink v. Model Serv. LLC, 2015 WL 6473005, at *3 (S.D.N.Y. Oct. 27, 2015)).  Importantly, "[b]ecause the damage from misstatements could well be irreparable" in FLSA collective actions, the district court must be able to exercise its discretion to attempt to correct the effects of such actions." Billingsley, 560 Fed. Appx. at 924; see also Hoffmann–La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989) (noting that court intervention in the collective action notice process may be necessary); Lillehagen v. Alorica, Inc., 2014 WL 12768156, at *4 (C.D. Cal. Dec. 18, 2014) ("From the moment a putative class or collective action complaint is filed, Defendants' communications with potential class members is subject to scrutiny and control.").

**B. Defendants' Communications with Current Nova and Southern Employees are Highly Improper and Rife with Potential for Coercion and Warrant Prompt Corrective Action**

Defendants' actions in taking workers to a hotel for meetings, asking them to sign documents stating that they have no claims against Defendants, and disseminating unprecedented

bonus payments warrant prompt corrective action by this Court. "Whether a communication is misleading or coercive—and therefore warrants judicial intervention—often depends not on one particular assertion, but rather the overall message or impression left by the communication." OConner, 444 F. Supp. 3d at 601 (internal quotation marks omitted). "A court therefore must examine the context in which the communications were made and the effect of the communications in determining whether, and how much, communication should be restricted." Id.

The communications here were misleading and coercive for several reasons. First, Nova and Southern were targeting their current employees, who are potential class and collective action members in this case. As numerous courts have held, there is an inherent danger when defendants or their agents communicate directly with class members about an ongoing case – particularly in the employment context. As the 11th Circuit Court of Appeals observed, "[a] unilateral communications scheme…is rife with potential for coercion," especially where the defendant and class members "are involved in an ongoing business relationship." Kleiner, 751 F.2d at 1202 (internal quotation marks omitted). This problem is exacerbated in the employee-employer context. See Ojeda-Sanchez v. Bland Farms, 600 F. Supp. 2d 1373, 1379 (S.D. Ga. 2009) (noting that "a past as well as a potential future employment relationship between the parties [] increases the risk that communications between them will have a coercive effect"); Burrell v. Crown Cent. Petroleum, Inc., 176 F.R.D. 239, 244 (E.D.Tex.1997) (noting that "an ongoing business relationship, such as employee and employer, may cause communications between litigants to be coercive").

Furthermore, these immigrant home care workers were taken to meetings with Defendants under highly coercive circumstances – they were picked up from their work

6

assignments during work hours, taken to a hotel where Defendants were present along with their counsel, and were asked to sign documents stating they had no claim against the Defendants. Courts have routinely issued corrective notice in similar situations. See Billingsley, 560 Fed. Appx. at 918 (new dispute resolution policy rolled out in "blitzkrieg fashion" following filing of action; targeted specifically to putative class members; acceptances obtained in coercive two-on-one meetings under deceptive pretenses); OConner, 444 F.Supp.3d at 602-04 (new arbitration policy was rolled out after action filed, and management pressured employees to quickly sign agreement). Compounding the coercive nature of this interaction is the fact that many of the home care workers speak little to no English, and were not able to fully understand the documents they signed.  See O'Connor v. Uber Techs., Inc., 2013 WL 6407583, at *6 (N.D. Cal. Dec. 6, 2013) (invalidating arbitration agreements distributed by defendant in part because "many Uber drivers are not native English speakers").

It is abundantly clear that Defendants' actions were intended to undermine the collective action mechanism and discourage participation in this case.  In similar circumstances, courts around the country have found that a protective order limiting future communications and/or a corrective notice is proper. See Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc., 214 F.R.D. 696, 697-98 (S.D. Ala. 2003) (collecting cases and concluding that "[a]busive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel")(citations omitted); see also OConner, 444 F. Supp. 3d at 597 (ordering corrective notice); Rogers v. WEBstaurant Store, Inc., 2018 WL 3058882, at *6 (W.D. Ky. June 20, 2018) (ordering corrective notice to be sent in light of

7

defendant's two emails to its employees, finding that the emails "discourage[] potential plaintiffs from joining the suit or chill[] participation in the collective action."); Ojeda–Sanchez, 600 F.Supp.2d at 1379–81 (granting a limited protective order in FLSA collective action where the defendants engaged in unsupervised, unsolicited, in- person interviews of the plaintiffs in an environment that encouraged speedy and uninformed decision-making); Longcrier v. HL–A Co., 595 F.Supp.2d 1218, 1229–30 (S.D. Ala. 2008) (striking declarations obtained through the defendants' abusive and misleading communications with prospective opt-in plaintiffs); Belt v. Emcare, Inc., 299 F.Supp.2d 664, 667-70 (E.D. Tex. 2003) (sanctioning and enjoining defendant employer from communicating *ex parte* with potential class action members, finding that defendant attempted to subvert the court's supervisory role by sending misleading and coercive communications to employees that discouraged them from joining FLSA collective action).

The fact that Defendants' meetings took place after Plaintiffs filed their Motion for Conditional Certification makes them all the more suspect. In Billingsley, the defendant employer obtained "declarations and arbitration agreements [from potential FLSA collective members] after the district court set forth the schedule and procedures for Billingsley's motion for conditional certification and notice … through back-room meetings that were highly coercive and interrogation-like." Billingsley, 560 Fed. Appx. at 916. The district court also "ordered that its supervised notice state that any potential plaintiff who felt that she signed the mandatory arbitration agreement under duress was allowed to opt-in to the collective action notwithstanding her agreement to the contrary." Id. at 917.  The Eleventh Circuit affirmed these remedial actions, explaining that "[t]he district court simply did what other district courts routinely do: exercise discretion to correct the effects of pre-certification communications with potential FLSA collective action members after misleading, coercive, or improper communications are made."

8

Id. at 922.  Here, as in Billingsley, Defendants have made a concerted efforts to undermine the collective and class action process in this case and diminish the numbers of opt-in plaintiffs.

### C. The Declarations or Releases Signed by Class Members Should be Struck or Invalidated

Any documents signed by class members in the course of their meetings with Defendants, stating they have no claims against Defendants, were obtained through coercion and should be struck or invalidated. "[C]ourts have found arbitration clauses and releases voidable when there is a record establishing actual or potential coercion or deception." Chen-Oster v. Goldman, Sachs & Co., 449 F. Supp. 3d 216, 255 (S.D.N.Y. 2020). "While there is no 'test' to determine whether there is such actual or potential coercion or deception, courts generally consider and weigh a number of case-specific factors" including:

> (1) the relative vulnerability of the putative class members; (2) evidence of actual coercion or conditions conducive to coercion; (3) whether the defendant targeted putative class members in a purposeful effort to narrow the class; (4) whether the [release] was unilaterally imposed on the putative class; and (5) evidence of misleading conduct, language, or omissions, including the extent to which the agreement does or does not mention the existence of the putative class action and related information.

Id.  See also Balasanyan v. Nordstrom, Inc., 2012 WL 760566, at *1–2, 4 (S.D. Cal. Mar. 8, 2012) (in FLSA action, refusing to enforce individual arbitration agreement obtained through improper class communication); Williams v. Securitas Sec. Servs. USA, Inc., 2011 WL 2713818, at *3 (E.D. Pa. July 13, 2011) (invalidating arbitration agreement obtained through "confusing and unfair communication" during pre-certification stage of FLSA litigation and ordering corrective measures); County of Santa Clara v. Astra USA, Inc., 2010 WL 2724512 (N.D. Cal. July 8, 2010) (invalidating releases obtained by letter to putative class).

Here, the class members who were targeted by Defendants are current employee who were taken to meet with Defendants (and their counsel) during their working hours. They were

asked to sign documents stating they have no claims against the Defendants and, as at-will employees, had little choice in the matter. Defendants apparently did not provide these workers with information about the pending lawsuit, the Plaintiffs' and class members' claims, or the workers' rights under the FLSA and CMWA. The coercive effect of Defendants' communications was compounded by the unilateral and unprecedented bonus payments. Given these circumstances, any declarations or releases signed by the workers during their meetings with Defendants must be invalidated.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court:

(1) issue a protective order barring Defendants from non-routine ex parte communications with class members;

(2) order Defendants to produce any document they asked workers to sign at the meetings;

(3) order Defendants to provide a list of class members they met with;

(4) order that a corrective notice be issued to all class members regarding their rights in this case;

(5) order that any declarations or releases obtained by Defendants are invalid; and

(6) order such other relief as the Court deems appropriate.

Respectfully submitted

/s/ *Mariusz Kurzyna*
Mariusz Kurzyna (ct28940)
ZIPIN, AMSTER & GREENBERG, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
Tel. 301-587-9373
Fax 240-839-9142
mkurzyna@zagfirm.com

Olena Savytska (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
osavytska@llrlaw.com

*Counsel for Plaintiffs and the proposed class and collective*