IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| YELENA SAVINOVA, *et. al.*, <br><br> *individually and on behalf of all others similarly situated,* <br><br> Plaintiffs, <br><br> v. <br><br> NOVA HOME CARE, LLC, *et. al.*, <br><br> Defendants. | Case No. 3:20-cv-01612-MPS |

**PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION
FOR PROTECTIVE ORDER AND OTHER RELIEF**

The plaintiffs, Yelena Savinova and Yemiliya Mazur (collectively, "Plaintiffs"), reply to Nova Home Care, LLC ("Nova") and Aleh Huliavatsenka ("Huliavatsenka") (together, "Nova Defendants") and to Southern Home Care Services, Inc. ("Southern") and Yuliya Novikava's ("Novikava) (together, "Southern Defendants") essentially identical memoranda (ECF Nos. 42 and 44) in opposition to Plaintiffs' Emergency Motion for Protective Order and Other Relief (ECF No. 36) ("Motion").  The Nova Defendants and Southern Defendants are collectively referred to herein as "Defendants".

The Motion was necessarily based, in part, on secondhand information and common-sense concern.  In their responses, Defendants do not merely rebut Plaintiffs assertions by presenting the firsthand information they hold.  Instead, they assail Plaintiffs' plea for the Court's protection with hyperbolic personal attacks, repeatedly mischaracterize Plaintiffs' arguments, and present facts in an inaccurate and misleading manner.

1

**Discussion of Defendants' alleged facts**

Defendants claim that their meetings with prospective opt-in plaintiffs "took place over the course of several days beginning March 8, 2020." ECF No. 44 at 2.[1]  In fact, the meetings were already taking place as of March 4, 2021, ECF No. 44-1 at 505, and lasted until at least March 23, 2021. *Id.* at 449.  The meetings thus commenced concurrently with workers' receipt of Nova's one-time "hazard pay" checks. *See* ECF Nos. 36-5, 35-6 (check and cover letter dated March 2, 2021); ECF No. 36-3 at ¶3 (worker's receipt of check on March 3 or March 4, 2021).

Defendants claim that both the interviews and the resultant declarations were voluntary, but the evidence they have provided is mixed at best.  Defendants first argue that the disclosures they allegedly provided at the outset of each meeting "eliminate the possibility of 'potential coercion'". ECF No. 44 at 13.  However, before Defendants' counsel could provide these disclosures, the workers had already had multiple communications with the Defendants, who provided shift coverage and transportation to the meeting locations where the workers were met by Novikava before being ushered in to meet with Defendants' counsel. ECF No. 36-3 at ¶6; ECF No. 44 at 2.

Defendants claim that their disclosures included "the nature of Plaintiffs' lawsuit," ECF No. 44 at 3, and that "[t]he acknowledgement signed by every interviewee specifically confirms that Defendants' counsel explained Plaintiffs' lawsuit…" *Id.* at 5.  However, the acknowledgment form says nothing about the nature of the suit and does not mention any explanation of the suit, only "that a class-action lawsuit has been filed in the District Court of Connecticut against Nova by former Nova employees Yelena Savinova and Yemiliya Mazur ("Savinova Case")." ECF No, 44-1 at 8.

---

[1] Because the Nova Defendants' and the Southern Defendants' memoranda are essentially identical, Plaintiffs cite only to Nova's memorandum throughout.

2

Defendants claim that "no SHCS or Nova manager was present during these interviews…" ECF No. 44 at 2.  However, Huliavatsenka apparently was present for some of the interviews. *See* ECF No. 44-1 at 469, 487, 505, 523, 541 (Acknowledgments that each worker "met with Adam J. Lyke, an attorney who represents Nova Home Care, LLC ("Nova"), and its managing member, Aleh Huliavatsenka.").  Defendants further claim that "[n]o other SHCS or Nova employees were present during the interviews" and that "[a]side from Defendants' counsel and the interviewee, the only other individual present was a professional third-party Russian/Ukrainian translator who has no affiliation with any parties in this case."  This claim is also demonstrably false. *See* ECF No. 44-1 at 199, 374 (Acknowledgments from two different Nova/Southern employees that they met with Defendants' counsel at the same time, at 11:15 a.m. on March 8, 2021).  Defendants also fail to explain how they managed to get those employees with whom they met over Zoom to review, edit, and sign the preprinted form affidavits unless someone from Nova was in the room with them.

Defendants also claim that "[a]ll statements were drafted based upon the interviewee's answers to interview questions, translated into Russian, and reviewed carefully and in detail for accuracy by the interviewees in their native language before they signed anything." ECF No. 44 at 6. Defendants immediately contradict the statement by stating that "most (although not all) of the caregivers (and putative class members) speak Russian *or Ukrainian* as their first language. *Id*. (emphasis added).  Although they both use a Cyrillic script, Russian and Ukrainian are very different languages and, while many Ukrainians know Russian as a second language, many others do not.  Moreover, as Defendants concede, not all of the declarants speak Russian or Ukrainian as their first language, including Ryszarda Kruczkiewicz, a Polish immigrant for whom English, Russian, and Ukrainian are not native languages.  Therefore, for many of the

declarations, it is not true that they were "reviewed carefully and in detail for accuracy by the interviewees in their native language before they signed anything."

Defendants argue that "interviewees were not simply asked to sign some preprinted or prepared document (whether in English or Russian)." ECF No. 44 at 6. They immediately concede that the March 4, 2021 "Nova-only statements" were preprinted but argue that "interviewees were told they could--and did--make handwritten changes where necessary." *Id*. However, as Defendants themselves concede, every last one of these workers made the same change, crossing out the statement "When I notified Nova that I worked through personal time or sleep time, I was properly paid" and replacing it by "handwriting in English and Russian 'I always had time for meal and sleep.'" *Id*. at 5. The only reasonable explanation for five declarants making the same edit with the same verbiage is that they were instructed to make it.

The declarations obtained jointly by Nova and Southern counsel are also largely the same prepared document. While these declarations are individualized as to each worker's dates of employment and numbers of days worked for each company, the bulk of each declaration's 37 paragraphs, including statements regarding working conditions are boilerplate. This is highlighted by the fact that, in many declarations, the statement "If I worked over 40 hours in a week for Nova, I was paid overtime by Nova" is followed by the incongruous statement "If I worked over 40 hours in a week for Southern, I was paid overtime by *Nova*." See ECF No. 44-1 at 32, 57, 184, 226, 268, 401, 422, 436 (emphasis added). Therefore, Defendants' claim that each declaration was "drafted based upon the interviewee's answers to interview questions, translated into Russian, and reviewed carefully and in detail for accuracy by the interviewees in their native language before they signed anything" is clearly false.

Defendants' claim that this was a slow and deliberate process where "each interview took approximately 1-2 hours", ECF No. 44-1 at ¶ 5, is also false. *See* ECF No. 44-1 at 50, 415 (meetings held at 45 minute interval); *Id*. at 155, 306 (same); *Id*. at 469, 487 (meetings held at 30 minute interval); *Id*. at 199, 374 (two meetings held at same time).

Finally, Defendants take issue with Plaintiffs' factually correct allegation that Defendants made "unilateral" and "unprecedented" bonus payments to their employees. ECF No. 44 at 7-9. But since they can't reasonably dispute the timing of the payments or that the payments were in fact unilateral or unprecedented, they deflect by ascribing to Plaintiffs an argument that the Plaintiffs simply have not made. Specifically, Defendants repeatedly attack "Plaintiffs' [alleged] argument that Defendants distributed 'unilateral' and 'unprecedented' bonus payments to caregivers *for providing statements in this case*." *Id*. (emphasis added). However, Plaintiffs have not alleged any such *quid pro quo*. Indeed, the only "argument" Plaintiffs have made regarding the payments is that, "coupled with the unprecedented bonus payments, the Defendants' communications have a high potential for coercion…", ECF No. 36-1 at 2, and that "[t]he coercive effect of Defendants' communications was compounded by the unilateral and unprecedented bonus payments." *Id*. at 10.

For its part, Southern blames its parent corporation for the allegedly unwitting decision to make the bonus payments to the putative collective members during the pendency of a lawsuit in which the workers will have to affirmatively opt-in in order to participate. But whatever Southern's motive may have been, to the workers it's a reminder of where their bread is buttered. Therefore, Plaintiffs correctly observed that the payments may affect the workers' decision whether to join the suit.

5

As for Nova, the one-time payments were made concurrently with the March 4, 2021 commencement of their declaration gathering meetings. *See* ECF Nos. 36-5, 35-6 (check and cover letter dated March 2, 2021); ECF No. 36-3 at ¶3 (worker's receipt of check on March 3 or March 4, 2021). Whether or not Nova intended it as such, from the workers' perspective, the payments certainly invite a returning of the favor.

### **Court intervention is warranted**

In their initial memorandum, the Plaintiffs have already discussed the case law applying the Supreme Court's pronouncement that "[b]ecause of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a *class action* and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) (emphasis added). What bears repeating are the exceptionally broad protections afforded by the FLSA and the much more vulnerable position of potential FLSA collective members, who must opt-in to participate in the suit, as compared to members of class actions, who are automatically included unless they affirmatively opt out.

"The Fair Labor Standards Act was designed to extend the frontiers of social progress by insuring to all our able-bodied working men and women a fair day's pay for a fair day's work." *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (internal quotation marks omitted). "[T]hese provisions were designed to remedy the evil of overwork by ensuring workers were adequately compensated for long hours, as well as by applying financial pressure on employers to reduce overtime." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008) (internal quotation marks omitted). "In service of the statute's remedial and humanitarian goals, the Supreme Court consistently has interpreted the Act liberally and afforded its protections exceptionally broad coverage." *Id*.

Accordingly, the courts have developed a number of doctrines to further the protections afforded to FLSA plaintiffs and would-be plaintiffs. For example, FLSA settlements require court approval to protect plaintiffs from "an employer's overreaching." *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1354 (11th Cir. 1982); *accord Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). Public policy considerations also dictate that FLSA settlement agreements are subject to public access and thus may not be filed under seal. *See Joo v. Kitchen Table, Inc.*, 763 F. Supp. 2d 643, 645-48 (S.D.N.Y. 2011) (noting "overwhelming consensus of district courts" on the issue). The courts also apply the normally extraordinary remedy of equitable tolling in the very common situation where employers fail to apprise workers of their FLSA rights through notice posting. *See Cruz v. Maypa*, 773 F.3d 138, 147 (4th Cir. 2014) ("absent a tolling rule, employers would have no incentive to post notice since they could hide the fact of their violations from employees until any relevant claims expired"); *accord Darowski v. Wojewoda*, No. 3:15-CV-803 (MPS), 2017 U.S. Dist. LEXIS 208122, at *13-23 (D. Conn. Dec. 19, 2017).

This recognition of FLSA plaintiffs' vulnerability to employer overreach also warrants a distinction between the level of protection required by FLSA collectives and Rule 23 classes. The need for protection is all the greater because potential FLSA collective members are much more susceptible to dissuasion since, in order to be part the suit, the workers have to take the affirmative step of opting in whereas the class members are automatically included unless they opt out. Some courts have recognized this important distinction. *See Belt v. Emcare Inc.*, 299 F. Supp. 2d 664, 669 (E.D. Tex. 2003) ("Defendants' conduct [in sending misleading letter] is more egregious in this collective action than it would be in a class action because potential class members must opt into the collective action rather than opt out as in a class action."); *Billingsley*

7

*v. Citi Trends, Inc.*, 560 F. App'x 914, 924 (11th Cir. 2014) ("Because FLSA plaintiffs must opt-in, unsupervised, unilateral communications with those potential plaintiffs can sabotage the goal of the FLSA's informed consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.'")

Defendants' reliance on *Austen v. Catterton Partners* is misplaced because, there, the Court opined that "[b]oth parties need to be able to communicate with putative class members — if only to engage in discovery regarding issues relevant to class certification — from the earliest stages of class litigation." *Austen v. Catterton Partners V, LP*, 831 F. Supp. 2d 559, 567 (D. Conn. 2011). By contrast, in the present case, there was no such need for discovery to take place before the court-authorized notice was sent to potential collective members. Defendants know what their policies and practices are. Obtaining information about individual employees' working conditions before the court authorizes the notice was not necessary because Defendants could not use it to oppose conditional certification anyway. *See Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) ("In ascertaining whether potential opt-in plaintiffs are similarly situated, courts should not weigh the merits of the underlying claims."); No. 10 Civ. 1385(CM), 2010 WL 2218095, at *1, 2010 U.S. Dist. LEXIS 54581 (S.D.N.Y. June 2, 2010) ("Weighing of the merits is absolutely inappropriate."); *Lynch v. United Services Auto. Ass'n*, 491 F. Supp. 2d 357, 368-69 (S.D.N.Y. 2007) (The court is not to "resolve factual disputes, decide substantive issues going to the merits, or make credibility determinations.").

Defendants state that "every single person interviewed expressed the intention to not participate in this lawsuit and expressed displeasure that it had been filed." ECF No. 44 at 4. This is what the *Billingsley* court was talking about when it warned that "unsupervised, unilateral communications with those potential plaintiffs can sabotage the goal of the FLSA's informed

consent requirement by planting the slightest seed of doubt or worry through the one-sided, unrebutted presentation of 'facts.'" Consequently, it is necessary and appropriate for the Court to order the remedies sought in the Plaintiffs' Motion.

                                        Respectfully submitted

                                        */ s / Mariusz Kurzyna*
Mariusz Kurzyna (ct28940)
ZIPIN, AMSTER & GREENBERG, LLC
8757 Georgia Avenue, Suite 400
Silver Spring, MD 20910
Tel. 301-587-9373
Fax 240-839-9142
mkurzyna@zagfirm.com

Olena Savytska (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
osavytska@llrlaw.com

*Counsel for Plaintiffs and the proposed class and collective*