**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| YELENA SAVINOVA *and* YEMILIYA | ) | 3:20-cv-01612 (SVN) |
| MAZUR, *individually and on behalf of* | ) | |
| *others similarly situated*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NOVA HOME CARE, LLC, SOUTHERN | ) | |
| HOME CARE SERVICES, INC., ALEH | ) | |
| HULIAVATSENKA, *and* YULIYA | ) | |
| NOVIKAVA, | ) | |
| Defendants. | ) | March 29, 2024 |

**JOINT RULING ON DEFENDANT SOUTHERN HOME CARE SERVICES, INC.'S**
**AND DEFENDANT YULIYA NOVIKAVA'S MOTIONS FOR SUMMARY JUDGMENT**

Sarala V. Nagala, United States District Judge.

Plaintiffs are a conditionally-certified collective of twenty-six live-in caregivers employed by Defendant Southern Home Care Services, Inc. ("Southern"), Defendant Nova Home Care, LLC ("Nova"), or both between October 27, 2017, and the present, seeking to recover unpaid overtime compensation pursuant to Section 16 of the Fair Labor Standard Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and unpaid hourly wages and overtime compensation pursuant to Connecticut Minimum Wage Act ("CMWA"), Conn. Gen. Stat. §§ 31-58 *et seq.*, 31-71a *et seq.*

Plaintiffs bring three separate claims. First, Plaintiffs who worked for both Southern and Nova allege that the companies artificially split workweeks worked by live-in caregivers on the same live-in assignment in order to avoid paying overtime. Plaintiffs claim Southern and Nova should be treated as joint employers such that any combined hours worked in excess of 40 hours per week must be compensated at an overtime rate of pay (the "overtime claims"). Second, Plaintiffs claim that both Southern and Nova improperly excluded time Plaintiffs spent sleeping when calculating wages absent a valid agreement to do so or, if there was an agreement, did not

pay for time spent working when sleep was interrupted; therefore, Plaintiffs are entitled to recover any hourly wages and overtime compensation owed when accounting for this time worked (the "sleep time claims").  Third, Plaintiffs allege that Nova improperly deducted additional time from Plaintiffs' wages for personal or meal breaks and that this time worked should also be accounted for in hourly wages and overtime (the "break time claims").

Southern and the executive director of its Connecticut office, Defendant Yulia Novikava (together, referred to as "Southern"), move for summary judgment against all Plaintiffs.  In the alternative, Novikava moves for a partial summary judgment holding that she is not an "employer" for purposes of the FLSA or CMWA.  For the reasons explained below, the Court GRANTS IN PART and DENIES IN PART Southern's motion for summary judgment, and DENIES Novikava's motion for partial summary judgment.

The Court finds there are genuine disputes of material fact pertinent to Plaintiffs' joint employer theory which preclude summary judgment on the overtime claims.

As for the sleep time claims, Southern is entitled to summary judgment against the eighteen Plaintiffs who only worked for Nova.  As for the remaining eight Plaintiffs' sleep time claims, there is no genuine dispute that Southern entered into an implied agreement to exclude sleep time with Plaintiff Lyudmyla Chumakova, though there are genuine disputes about whether Southern entered into agreements with the other seven remaining Plaintiffs.  Of those remaining seven, there is no genuine dispute that Southern did not have actual or constructive knowledge of sleep time interruptions experienced by Plaintiff Tatyana Fedotova and Plaintiff Semir Ahmetovic.  Neither finding disposes of the remaining eight Plaintiffs' sleep time claims entirely, however.  There is a genuine dispute whether Plaintiff Chumakova was compensated for all instances that her agreed-

to sleep period was interrupted by calls to duty; and whether Plaintiff Fedotova and Plaintiff Sabina Ahmetovic entered into an agreement to exclude sleep time at all.

The Court also finds there is a genuine dispute whether Southern violated the FLSA willfully, such that a three-year statute of limitations period may apply and liquidated damages may be appropriate. The Court declines to equitably toll the statute of limitations period further. The Court also rejects Southern's three plaintiff-specific statute of limitations arguments.

Finally, there is a genuine dispute whether Novikava, as executive director of Southern's Connecticut operations, exercised operational control or ultimate control over Plaintiffs under the FLSA and CMWA's tests for individual "employer" liability.

## I.      FACTUAL BACKGROUND

The following facts are undisputed, unless otherwise noted.[1]

### A.  Connecticut's Home Care Program for Elders

The Connecticut Department of Social Services ("DSS") provides Medicaid-funded home care for elderly individuals in the state of Connecticut as part of its Home Care Program for Elders. Pls.' L.R. 56(a)2 St., ECF No. 164-1 ¶¶ 19–20. In order for an elderly individual to qualify for the program, DSS verifies that the individual's needs are sufficiently manageable such that a live-in caregiver would be able to obtain eight hours of sleep per night, five of which must be uninterrupted. *Id.* ¶¶ 21–23.

If an elderly individual qualifies for the program, a state "access agency" works with DSS to hire a private home health care company to provide the requested services. *Id.* ¶ 24. Multiple home health care companies may be hired to provide care for the same elderly individual on different days of the week, such as when an individual's preferred caregiver works for different

---

[1] Where facts are undisputed, or a denial is not followed by citations to admissible evidence, the Court cites only to Plaintiff's Local Rule 56(a)2 Statement. *See* D. Conn. L.R. 56(a).

companies on different days. *Id.* ¶¶ 37–38.  DSS and state access agencies provide guidance to the home health care companies to ensure sleep time rules and pay practices for the caregivers they employ are compliant with the FLSA and CMWA. *Id.* ¶ 24.

B. Southern

Southern is a home health care company headquartered in Kentucky and a wholly-owned subsidiary of Res-care, Inc. *Id.* ¶¶ 1, 3.  In 2013, Southern acquired five small Connecticut home care companies that it referred to collectively as "Lina."  Defs.' Ex. N, Novikava Dep., ECF No. 149-5 at 385, 45:10–18.  Southern hired Novikava, who was a bookkeeper for Lina, as the executive director of Southern's Connecticut operations. *Id.* 45:3–46:19.  She has no ownership interest in Southern.  Pls.' L.R. 56(a)2 St. ¶ 16.

Southern's personnel policies and procedures are promulgated at the corporate level out of Kentucky and implemented by local branch offices, such as the singular Connecticut office in Shelton, Connecticut, which oversees approximately 150 to 175 caregivers in the state. *Id.* ¶¶ 13, 17–18.  Novikava is one of six Southern employees who work in the Shelton office. *Id.* ¶ 17. Southern also employs roughly 150-175 caregivers who assist clients with daily living activities at their homes, including on a live-in basis. *Id.* ¶¶ 2, 18, 20.

Southern operates in Connecticut only as part of the Home Care Program for Elders; thus, it is dependent on reimbursements it receives from Medicaid for providing services. *Id.* ¶¶ 2, 19. Southern uses the reimbursements to pay its caregivers and cover operating expenses.  Novikava Decl., ECF No. 149-3 at 2, ¶ 9.  In 2019 and 2020, however, the Medicaid reimbursement rates (which are flat, per diem rates that do not fluctuate based on time worked) failed to increase commensurate with increases in the Connecticut minimum wage. *Id.* ¶¶ 9–10. As a result, to remain profitable, Southern limited the number of live-in shifts a caregiver works in each week to

4

two 16-hour shifts; otherwise, the live-in caregiver would begin earning overtime pay midway through their third 16-hour shift, when they completed forty hours of work.  Pls.' L.R. 56(a)2 St. ¶¶ 35–36.  In implementing this policy, Southern relied on federal and state-level guidance.  *Id.* ¶¶ 25–26.  For example, the Department of Labor ("DOL") had issued guidance in 2013, in response to the elimination of the FLSA's prior "domestic worker" exemption, that "[e]mployers can avoid the overtime premium payment . . . merely by limiting the employee to 40 hours of work in a workweek" and "the Department expects direct care workers who lose hours at one agency will readily be able to obtain an opening at another agency."  DOL Application of the FLSA to Domestic Service, 78 Fed. Reg. 60555 (Oct. 1, 2013) (codified at 29 C.F.R. Part 552).

C.  Southern's Sleep Time Policies

By way of background, the relevant legal framework for compensation of sleep time is as follows.  When an employee is required to be on duty for twenty-four hours or more, the employer and the employee "may agree to exclude . . . a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep."  29 C.F.R. § 785.22(a).  If there is an agreement to exclude time but the sleeping period "is interrupted by a call to duty, the interruption must be counted as hours worked."  29 C.F.R. § 785.22(b).  If the employee cannot get "at least 5 hours' sleep during the scheduled period[,] the entire time is working time."  *Id.*

The parties vigorously dispute whether live-in caregivers are informed of Southern's policy to exclude eight hours of sleep time from their pay, and that caregivers should have the opportunity to receive at least five hours of uninterrupted sleep.  Southern cites to deposition testimony from Novikava that a Southern "scheduler" explains verbally to all "applicants" or "potential

employee[s]" that "[i]n [a] 24-hour shift, you will have eight hours of sleep," "[i]t has to be five uninterrupted," and "you will be paid 16" but "if you did not have this, you will be paid for the night."  Novikava Dep., ECF No. 149-5 at 399, 112:20–113:2.  By contrast, Plaintiffs cite testimony by live-in caregivers stating this was never communicated, or at least not understood. For example, when asked if she knew she should let Southern know if she had trouble sleeping, Plaintiff Iryna Belavus responded "[f]rankly, no.  Nobody told me this."  Pls.' Ex. 7, Belavus Dep., ECF No. 164-2 at 57, 26:8–15.

The parties similarly dispute whether Southern has implemented an adequate reporting system in the event that a live-in caregiver is unable to obtain eight hours of sleep, five of which is uninterrupted.  Since late 2016, all Southern caregivers have recorded their hours telephonically through a state-mandated electronic visit verification ("EVV") system.  *See* Novikava Dep., ECF No. 149-5 at 411, 128:15–131:4; ECF No. 149-2 at 15 n.10.  Southern claims that it instructs caregivers to call the office the morning after a shift with interrupted sleep to report the disruption to Southern schedulers.  Novikava testified that "the scheduler will take the call," and the scheduler will "write down what time they woke up, what they need to do" before the scheduler then gives Novikava "all of this information for processing."  Novikava Dep., ECF No. 149-5 at 403, 118:3–23.  Sleep disruptions are then noted in Southern's internal recordkeeping system, "Point of Care." *Id.* 66:1–18.  Southern also introduces a copy of the handwritten time log live-in caregivers were required to use until the switch to the EVV system in late 2016, and Novikava states the log is still used by employees to report instances of missed sleep time.  *Id.* 128:15–129:4.  The log contains a written notice that:  "Employee sleep time on live-in shifts MUST total eight hours and each 24-hour shift must include one period of at least five hours uninterrupted sleep. If either of these do

not occur, you must report actual sleep time on a sleep time record and notify the office immediately."  Novikava Dep., Ex. 11, ECF No. 149-5 at 415.

Plaintiffs claim they were unaware of this reporting policy.  For instance, when presented with a copy of Southern's time logs at her deposition, Plaintiff Chumakova testified that "[a]t that time I could not read [English] at all" and "I was just told that in 24 hours you will have 8 hours for sleep and you will be paid for 16 hours."  Pls.' Ex. 9, Chumakova Dep., ECF No. 164-2 at 99, 88:12–89:1.  Plaintiff Belavus similarly testified that "I didn't complain [of sleep disruptions] because I did not know I could."  Belavus Dep., ECF No. 164-2 at 58, 29:14–16.

D.   Relationship between Southern with Nova

Nova is a formally separate home health care company and single-member Limited Liability Company ("LLC") owned by Defendant Aleh Huliavatsenka.  Pls.' L.R. 56(a)2 St. ¶ 4.  Unlike Southern, it is headquartered in Connecticut and only operates in this state.  *Id.*

Southern contends it is generally unaware of whether one of its caregivers is working for another home healthcare company during the week, including Nova.  *Id.* ¶ 41.[2]  In practice, Plaintiffs aver Southern caregivers do not split weeks with companies besides Nova.  Pls.' Add'l Mat. Facts, ECF No. 164-1 ¶ 17.

The parties also dispute the degree of coordination between Southern and Nova.  It is undisputed that the two companies are formally separate.  Southern and Nova have separate phone numbers, websites, file and client management systems, policies and procedures, payroll processing systems, and recordkeeping and accounting systems.  Pls.' L.R. 56(a)2 St. ¶ 9.  Southern also does not supervise any Nova employees while the employee is working a Nova shift,

---

[2] In connection with Nova's motion for summary judgment, Nova and Plaintiffs agree it is undisputed that, because Southern limits the number of days caregivers can work, caregivers desiring more hours work for multiple companies, including Nova.  Pl.'s L.R. 56(a)2 St. in Opp. to Nova's Mot. Summ. J., ECF No. 165-1 ¶ 22(a).

and vice versa.  *Id.* ¶ 12.  Southern and Nova have no common owners, officers, or directors, *id.* ¶ 7, though the parties dispute whether the two share any of the same managers or other staff.  *See* Pls.' Ex. 23, Lukianova Dep., ECF No. 164-2 at 216, 25:7–16 (Plaintiff Lukianova testifying that Southern employee Ruslana, who visited Lukianova and reviewed documents, "said she is from [Defendant] Aleh [Huliavatsenka]").

Southern cites testimony from Novikava and Huliavatsenka that the two do not communicate with one another about clients, employees, or any other business matter.  *See* Novikava Decl., ECF No. 149-3 at 5, ¶ 22 ("SHCS does not share any business-related information with Nova"); Novikava Dep., ECF No. 149-5 at 377, 13:9–14:15 ("I talked to my team in the office, asked them.  They said no communication.  And I say the same about me as well, no communication."); Def.'s Ex. H, Huliavatsenka Dep., ECF No. 149-5 at 272, 19:11–20, 20:14–21 (stating he did not speak to anyone at his Nova office about whether they spoke to anyone at Southern about splitting weeks when preparing for the deposition, and that he doesn't "communicate with anyone at Southern").

But Plaintiffs cite evidence indicating otherwise.  One Plaintiff, Portia Atongdem, testified that she had been "loaned" by Huliavatsenka to work for Southern as part of an informal agreement to share caregivers when short-staffed:  "when [Huliavatsenka] is short and has more cases, [Southern] help him out, so he was also helping them out."  Pls.' Ex. 5, Atongdem Dep., ECF No. 164-2 at 48, 64:12–23.  Other Plaintiffs testified that Huliavatsenka handed out applications for both Nova and Southern and that they only communicated with Huliavatsenka when working for both companies.  For example, Plaintiff Galyna Golova testified that, even while she worked for Southern, "all problems will be solved through Aleh."  Pls.' Ex. 17, Golova Dep., ECF No. 164-2 at 149, 44:1–10.  Plaintiff Yelena Savinova testified that she "communicated only with Aleh and

never with Yuliya" and that Huliavatsenka handed out applications for both Southern and Nova. Pls.' Ex. 34, Savinova Dep., ECF No. 164-3 at 127, 7:6–7; *id.* at 132, 39:19–25. Plaintiff Tatyana Fedotova has declared that although she worked for both Southern and Nova, she only ever received an application for Nova from Huliavatsenka and her time off requests were handled exclusively by Huliavatsenka, without her notifying anyone at Southern. Pls.' Ex. 14, Fedotova Decl., ECF No. 164-2 at 131–32, ¶¶ 4, 6. Plaintiff Chumakova stated that Huliavatsenka "informed [her] that [her] pay would be split between Nova and Southern, with Nova paying for four days and Southern paying for three days." Pls.' Ex. 10, Chumakova Decl., ECF No. 164-2 at 103, ¶ 5.

Plaintiffs also state that Huliavatsenka, the founder and sole member of Nova, and Novikava, the executive director of Southern, "live as husband and wife" with their child. Pls.' Add'l Mat. Facts ¶ 7. *See also* Chumakova Decl. ¶ 16 (stating that she saw Huliavatsenka at a restaurant to celebrate Novikava's birthday, who he referred to as his "wife"); Pls.' Ex. 19, Huliavatsenka Dep., ECF No. 164-2 at 163–164, 38:12–39:21 (stating that Novikava lived with him in "2014, 2017" along with their son who lived there from 2015 until 2017); *id.* at 175, 69:6– 17 (confirming that Huliavatsenka and Novikava began dating in 2014 and took a trip to Belarus in 2016 together with their son); Pls.' Ex. 31, Novikava Dep. ECF No. 164-3 at 87, 95:11–96:22 (stating that since 2019, Novikava has used a car owned by Huliavatsenka but does not pay for use of his car and that although Huliavatsenka does not pay child support, he pays for their son's activities). Novikava testified that Huliavatsenka pays her rent to use space in one of her homes, *id.* at 89, 97:2–25, but that they have not been in a romantic relationship since 2017, *id.* at 90, 98:11–15.

## II.     PROCEDURAL BACKGROUND

Named Plaintiffs Yelena Savinova and Yemiliya Mazur filed the present three-count action in federal court on October 27, 2020, on behalf of themselves and others similarly situated, seeking to recover unpaid overtime compensation under Section 16(b) of the FLSA and unpaid hourly wages and overtime compensation under the CWMA.  Compl., ECF No. 1.  Plaintiffs bring three main claims.  First, Plaintiffs who worked for both Southern and Nova bring "overtime claims" alleging that the companies artificially split workweeks in order to avoid paying one and one-half times Plaintiffs' regular hourly rate for all hours that exceeded forty hours in one week period.  Second, Plaintiffs bring "sleep time claims" alleging that both Southern and Nova improperly excluded time spent sleeping absent a valid agreement to do so and/or did not pay for time spent working when sleep was interrupted; therefore, Plaintiffs are entitled to recover any hourly wages and overtime compensation owed when accounting for this time worked.  Third, Plaintiffs bring "break time claims" alleging that Nova improperly deducted additional time from Plaintiffs' hourly wages and overtime compensation for purported personal or meal breaks.[3]

The Court (Shea, J.) first conditionally certified a collective of live-in caregivers who worked for Nova but denied conditional certification with respect to Southern.  ECF No. 47.  Three months later, Judge Shea granted a renewed motion for conditional certification of a collective of both Nova and Southern live-in caregivers.  ECF No. 60.  Following transfer of the case to the undersigned, the Court authorized notice to be sent to all current and former live-in caregivers of Southern and/or Nova between October 27, 2017, and the present.  ECF No. 75.

---

[3] Although the break time claims are alleged generally in the complaint, Plaintiffs do not dispute Southern's statement in its motion for summary judgment that this claim is only asserted against Nova, because Southern does not deduct break time from hours worked.  *See* ECF No. 149-2 at 23 n.19.

Thereafter, twenty-four Plaintiffs opted in to join the collective, forming a collective of twenty-six Plaintiffs. Pls.' L.R. 56(a)2 St. ¶ 42. Eighteen Plaintiffs worked only for Nova: Atongdem, Justice Asmah, Mariam Doumbia, Lateefatu Fuseini, Karen Harrison, Viktoria Ilina, Maria Kalata, Marianna Jaksina, Natalia Kos, Mazur, Ashley McLaughlin, Jessica Monahan, Halina Rutkowska, Neo Silva Seleka, Ruby Spencer, Galyna Vlasova, Svitlana Voroshylova, and Hanifa Yakubu. *Id.* Seven Plaintiffs worked for Southern and Nova: Sabina Ahmetovic, Belavus, Chumakova, Fedotova, Golova, Lukianova, and Savinova. One Plaintiff, Semir Ahmetovic, worked only for Southern. *See id* ¶¶ 43–92.

Several post-discovery motions are pending. Both Southern (joined by Novikava) and Nova (joined by Huliavatsenka) have filed motions to decertify the FLSA collective action. *See* ECF No. 147 (Nova), 150 (Southern). Southern (joined by Novikava) and Nova (joined by Huliavatsenka) have each moved for summary judgment against all Plaintiffs. ECF Nos. 146 (Nova), 149 (Southern). Novikava has filed a separate motion for partial summary judgement. ECF No. 154. Plaintiff have moved for class certification. ECF No. 153. The Court addresses only Southern and Novikava's summary judgment motions below in this Ruling.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A disputed fact is material only where the determination of the fact might affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). With respect to genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing there is no genuine issue of material fact in dispute will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears an initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. A movant, however, "need not prove a negative when it moves for summary judgment on an issue that the [non-movant] must prove at trial. It need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury finding in his or her favor. *Anderson*, 477 U.S. at 249. If the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation and internal quotation marks omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## IV.   SOUTHERN'S MOTION FOR SUMMARY JUDGMENT

### A.  Joint Employer Theory

The Court first finds there are genuine disputes of material fact as to whether Southern and Nova were joint employers such that the hours of Plaintiffs who worked for both companies should be aggregated for purposes of calculating overtime compensation owed under the FLSA or CMWA in light of evidence that the companies, particularly through the actions of Huliavatsenka, jointly managed live-in caregivers.[4]

### 1.  Legal Standard

The FLSA defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The U.S. Supreme Court has noted that his definition is one of "striking breadth" which "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles."  *Nationwide Mut. Ins. Co., v. Darden*, 503 U.S. 318, 326 (1992). Thus, the Second Circuit and district courts "ha[ve] treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Barfield v. N.Y.C Health and Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008).

Relevant here, "federal regulations and Second Circuit precedent recognize the possibility of *joint employment* for purposes of determining FLSA responsibilities."  *Id.* at 141 (emphasis added).  There are two generally recognized categories of joint employment:  (1) *vertical* joint employment, "when an employee of one employer (referred to . . . as an 'intermediary employer') is also, with regard to the work performed for the intermediary employer, economically dependent

---

[4] Southern argues, and Plaintiff does not dispute, that joint employment analyses under the FLSA and CMWA are similar in material respects.  *See* ECF No. 149-2 at 26 n.21.  The parties only cite to case law concerning joint employment under the FLSA.  The Court therefore does not address whether a meaningfully different standard for joint employment applies under the CMWA.

on another employer," and (2) *horizontal* joint employment, when "two (or more) employers each separately employ an employee" but "are sufficiently associated with or related to each other with respect to the employee." *Murphy v. Heartshare Human Servs. of New York*, 254 F. Supp. 3d 392, 396–97 (E.D.N.Y. 2017) (quoting Opinion Letter from U.S. Dep't of Labor ("DOL"), Wage & Hour Div., 2016 WL 284582, at \*4 (Jan. 20, 2016) (the "2016 DOL Opinion")).  The parties focus exclusively on whether Southern and Nova are *horizontal* joint employers.[5]

Under a horizontal joint employment analysis, if "employment by one employer *is not completely disassociated from employment by the other employer(s),* all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the [FLSA]." *Id.* at 298 (citing then-current version of § 791.2(e)(2)).  As the DOL reiterated in its 2021 recission, it "has been the Department's position for decades" that horizontal joint employment exists in the following three situations, among others:

> (1) [t]here is an arrangement between the employers to share the employee's services; (2) one employer is acting directly or indirectly in the interest of the other employer in relation to the employee; or (3) the employers share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

86 F.R. 40939-01, 2021 WL 3207510, at \*40954.  *See also Murphy*, 254 F. Supp. 3d at 398 (articulating the same DOL standard).  The 2016 DOL Opinion elaborates that the following

---

[5] The federal regulations regarding joint employment, which had been in place in some form since 1958, were rescinded effective September 21, 2021.  *See* 29 C.F.R. § 791.2 (reserved by DOL, Rescission of Joint Employer Status under the FLSA Rule, 86 F.R. 40939-01, 2021 WL 3207510 (July 30, 2021)).  The DOL decided to rescind the regulations after a court in the Southern District of New York found that the portion of the Joint Employer Rule concerning vertical joint employment violated the Administrative Procedures Act.  *See* 86 F.R. 40939-01, 2021 WL 3207510, at \*40952 (referencing *New York v. Scalia*, 490 F. Supp. 3d 748, 795 (S.D.N.Y. Sept. 8, 2020)).  The DOL rescinded the Joint Employer Rule in its entirety, however, because "it would be difficult and impractical for § 791.2(e) [the part relating only to horizontal joint employment] to remain alone." *Id.* at \*40954.  The DOL emphasized that "it did not reconsider the substance of its longstanding horizontal joint employer analysis" which will "continue to be . . . as it was[.]" *Id.*  Because the DOL continues to endorse the horizontal joint employment framework and no party contests its applicability, the Court applies it here.

factors are relevant to determining whether two or more employers are horizontal joint employers

in any of the above three situations:

- who owns the potential joint employers (i.e., does one employer own part or all of the other or do they have any common owners);
- do the potential joint employers have any overlapping officers, directors, executives, or managers;
- do the potential joint employers share control over operations (e.g., hiring, firing, payroll, advertising, overhead costs);
- are the potential joint employers' operations inter-mingled (for example, is there one administrative operation for both employers, or does the same person schedule and pay the employees regardless of which employer they work for);
- does one potential joint employer supervise the work of the other;
- do the potential joint employers share supervisory authority for the employee;
- do the potential joint employers treat the employees as a pool of employees available to both of them;
- do the potential joint employers share clients or customers; and
- are there any agreements between the potential joint employers.

2016 DOL Opinion, 2016 WL 284582, at *6–7. *See also Murphy*, 254 F. Supp. 3d at 398–

99 (listing same factors).

Examples of horizontal joint employment identified by the DOL include "separate

restaurants that share economic ties and have the same managers controlling both restaurants," as

well as "home health care providers that share staff and have common management."  2016 DOL

Opinion, 2016 WL 284582, at *4 (citing *Chao v. A-One Medical Servs., Inc.*, 346 F.3d 908 (9th

Cir. 2003)).  In *Chao*, the Ninth Circuit upheld the district court's finding below that two home

healthcare companies, A-One and Alternative, were horizontal joint employers because they were

both "controlled" by the same individual, Lorraine Black.  346 F.3d at 915.  Although another

individual had "ultimate authority over the financial operations" of Alternative, Black "had

effectively undisputed control over Alternative's operations":  Black managed the two companies

"to service home health patients, who were clients of either company, utilizing the same pool of

nurses, the same scheduler, and the same phone service." *Id.* at 915–16 (internal quotation marks and citations omitted).

The Second Circuit has not yet addressed how courts should consider claims of horizontal joint employment in particular, but has identified two sets of factors to assesses whether an entity is an employer for FLSA purposes in general:  the four "formal control" factors from *Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984), and, if the entity lacks formal control, the six factors for "functional control" from *Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003).  *See Barfield*, 537 F.3d at 143.  Because these two sets of factors assess the economic reality of the relationship between *the employee* and *employer*, they are helpful for vertical joint employment analyses.  But they may be less applicable in the horizontal joint employment context, where the focus is on the relationship between the two or more *employers* in relation to the employees.  *Cf. Murphy*, 254 F. Supp. 3d at 396–98 (discussing the formal control test and functional control test in context of vertical joint employment, but only § 791.2 in the context of horizontal joint employment); *Suarez v. Murray*, No. 20 Civ. 3514 (JCM), 2021 WL 1240518, at *5–6 (S.D.N.Y. Apr. 2, 2021) (same).  Neither party argues that the Court should apply factors set forth in *Carter*, *Zheng*, or *Barfield* in this case.  The Court therefore applies the DOL factors to Plaintiffs' claim of joint employment, which nonetheless reflect the U.S. Supreme Court and Second Circuit's instruction that FLSA employer-employee relationships "should be grounded in 'economic reality rather than technical concepts.'"  *Barfield*, 537 F.3d at 141 (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)).  *See also Murphy*, 254 F. Supp. 3d at 400 (proceeding similarly).

2. *Application*

The Court finds there is a genuine dispute as to whether Southern and Nova should be considered horizontal joint employers for FLSA or CMWA purposes, which precludes summary judgment.  Southern primarily argues that Plaintiffs cannot show a genuine dispute of fact because they lack personal knowledge as to Southern or Nova's formal ownership and management structure.  But Plaintiffs need not show that the two are formally related through their personal knowledge in order to proceed with their joint employment theory to recover overtime wages.  Indeed, it might be unusual for employees to have significant personal knowledge of their employers' particular corporate structures.  Rather, Plaintiffs permissibly rest on the evidence in the record which falls under at least two of the three examples of horizontal joint employment identified by the DOL:  that one employer is acting directly or indirectly in the interest of an employer in relation to the employee and that the two companies may effectively share common management and control even if not formally part of the same company.

Plaintiffs' evidence on this issue falls into three general categories:  (1) the testimony of a single plaintiff, Plaintiff Atongdem, that she has been "loaned" by Huliavatsenka to Southern as part of an informal short-staffing agreement;  (2) other Plaintiffs' testimony that Huliavatsenka would handle applications for both Southern and Nova and that they only communicated with Huliavatsenka while working for both companies; and (3) evidence of a personal relationship between Huliavatsenka and Novikava.  The Court questions whether the deposition testimony of single plaintiff is sufficient to create a material dispute of fact about the existence of an agreement to share employees (the first situation referenced by the DOL), and whether the evidence concerning a personal relationship between Huliavatsenka and Novikava is truly probative of a joint employment situation in this context.  Nonetheless, the second category of testimony creates

a genuine dispute as to whether Nova may have been acting in Southern's interest by helping recruit and manage employees; and whether the two effectively had common management or control through Huliavatsenka's handling of applications for both companies and caregiver requests such as time off and sleep disruptions (the second and third situations). This evidence at least shows the additional DOL factors of "inter-mingled" operations, with both employers "treat[ing] the employees as a pool of employees available to both of them," and "shar[ing] clients." 2016 DOL Opinion, 2016 WL 284582, at *7.

Although there was more formal coordination present in other cases denying summary judgment, such as *Murphy* and *Lopez v. Chock Dee Corp.*, No. 17 Civ. 2731 (AKH), 2018 WL 11464040 (S.D.N.Y. Dec. 12, 2018), Southern has not shown that summary judgment should be granted in its favor here. First, Southern misstates one key "fact" about *Murphy*: the special education school and the attached residence in *Murphy* were *not* owned by the same non-profit company. ECF No. 149-2 at 27 (stating "the school and residence were both owned by the same non-profit company"). Rather, the school and residence were "separate entities controlled by separate non-profit organization[s]." *Murphy*, 254 F. Supp. 3d at 403. In *Murphy*, the court found that the school and residence may be horizontal joint employers of the plaintiff-teachers because, although they had separate hiring and firing processes, paychecks, and benefits, they employed many of the same teachers, and the teachers oversaw the same children at the school and residence and performed overlapping duties. *Id.* at 403–04. This was "more than sufficient" to establish a genuine dispute of material fact concerning horizonal joint employment. *See id.* at 402–03. As *Murphy* emphasized, "[c]ourts must have great latitude in determining whether a joint employment relationship exists in order to comply with the spirit of the overtime law." *Id.* at 402. This principle supports a denial of summary judgment here, where there is evidence that Huliavatsenka acted on

18

behalf of both companies and, thus, the companies may have had intermingled operations to at least some degree.

Similarly, *Lopez* does not support Southern's position.  In *Lopez*, the court denied summary judgment and allowed plaintiffs to proceed on a horizontal joint employment theory where there was evidence that two nearby restaurants were owned by two divorced individuals who had a child together; used similar pay records; and collectively determined employees' schedules; and the owners had a common presence in both restaurants.  2018 WL 11464040 at *2, 5.  Plaintiffs have offered evidence of similar facts as to Southern and Nova.  For example, there is evidence that Plaintiffs shared days between the two employers and that Huliavatsenka recruited and managed workers for both companies.  The *Lopez* court also found the former personal relationship between the owners there "probative of the separate ownership and operation of the restaurants," but ultimately "insufficient" to warrant summary judgment in the defendant's favor.  *Id.* at *5.  Here, too, Plaintiffs have put forth evidence of a former personal relationship between Huliavatsenka and Novikava, which alone may not be sufficient to raise a triable issue that their companies were joint employers of Plaintiffs; but in combination with the evidence about Huliavatsenka's acting on behalf of both companies, Plaintiffs have supplied evidence from which a jury could reasonably conclude that Southern and Nova operated as joint employers.

The Court is mindful that it is the state access agencies who, under the Home Care Program for Elders, contract with either Southern, Nova, or another home health care company to assign live-in caregivers to clients.  But there is no case law that the presence of a neutral, third party (or even one from the state, for that matter) eliminates the existence of a horizontal joint employer relationship between two employers who may nonetheless still share common management or

work to the other's benefit within this structure.  The Court therefore finds that Southern is not entitled to summary judgment on the ground that Southern and Nova are not joint employers.

B.  Individual Sleep Time Claims

Plaintiffs concede that Southern is entitled to summary judgment as to the sleep time claims of the eighteen Plaintiffs who have never worked for Southern:  Asmah, Atongdem, Doumbia, Fuseini, Harrison, Ilina, Kalata, Jaksina, Kos, Mazur, McLaughlin, Monahan, Rutkowska, Seleka, Spencer, Vlasova, Voroshylova, and Yakubu.  ECF No. 164 at 3.  This leaves the Court to evaluate Southern's arguments concerning deficiencies in the individual sleep time claims of the eight remaining Plaintiffs—Sabina Ahmetovic, Semir Ahmetovic, Belavus, Chumakova, Fedotova, Golova, Lukianova, and Savinova—for the payment of overtime compensation under the FLSA, and hourly wages and overtime compensation under the CMWA.

1.  *FLSA and CMWA Overtime Legal Standards*

The FLSA mandates that, absent specific expectations, "no employer shall employ any of his employees who in any workweek . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  The CMWA sets similar overtime wage requirements, and the requirement that employers pay employees at least the Connecticut minimum wage for all hours worked.  *See* Conn. Gen. Stat.  § 31-58 *et seq.*, § 31-71a *et seq.  See also Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 263 n.2 (D. Conn. 2002) (explaining that the CMWA "provides wage and overtime guarantees similar to the FLSA").

A dispute for overtime wages under the FLSA and CMWA is generally governed by the burden-shifting framework set forth in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946);

*see also Schoonmaker v. Lawrence Brunoli, Inc.*, 265 Conn. 210, 243 (2003) (applying *Anderson* to a CMWA claim). "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citing *Anderson*, 328 U.S. at 686–87); *see also Modise v. CareOne Health Servs., LLC*, 638 F. Supp. 3d 159, 174 (D. Conn. 2022). Under *Anderson*, a plaintiff-employee must show "there is a reasonable basis for calculating damages assuming that a violation has been shown." *Kuebel*, 643 F.3d at 364–65. This burden "is low and can be met by that employee's recollection alone." *Arasimowicz v. All Panel Sys., LLC*, 948 F. Supp. 2d 211, 224 (D. Conn. 2013). If the employee satisfies this initial burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687–88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

### 2. *Sleep Time Compensation*

Sleep, as a general matter, is considered "work" for FLSA and CMWA purposes, if the employee is required to be on duty. *See* 29 C.F.R. § 785.21. If the employee is required to be on duty for twenty-four hours or more, the employer and the employee may agree to exclude up to eight hours of sleep time from hours worked when calculating compensation. The FLSA's "sleep time" regulations state that the employer and employer may agree to exclude "a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and employee can usually enjoy an uninterrupted night's sleep." 29 C.F.R. § 785.22(a). The agreement may be either express or implied, and may, but

need not be, in writing.  *See* U.S. Dep't of Labor, Field Assistance Bulletin No. 2016-1, Exclusion of Sleep Time from Hours Worked by Domestic Service Employees 5 (Apr. 25, 2016), available at https://www.dol.gov/whd/FieldBulletins/fab2016_1.pdf (last visited Mar. 14, 2024) ("The reasonable agreement must be an employer-employee agreement and not a unilateral decision by the employer, and it should normally be in writing in order to preclude any possible misunderstanding of the terms and conditions of an individual's employment.") (cleaned up)).

If the employer and employee have an agreement to exclude sleep time but "the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked."  29 C.F.R. § 785.22(b).  If the employee "cannot get at least 5 hours' of sleep" as a result of the interruption or interruptions, "the entire scheduled [sleep] period is working time."  *Id.*

In addition, in order for employers to exclude the sleep time of live-in caregiver, the live-in caregivers must be provided "adequate sleeping facilities" under 29 C.F.R. § 785.22(a). Although whether an arrangement is "adequate sleeping facilities" is a fact-intensive inquiry, employers generally will have provided "adequate sleeping facilities" when "the employee has access to basic sleeping amenities, such as a bed and linens; reasonable standards of comfort; and basic bathroom and kitchen facilities (which may be shared)."  U.S. Dep't of Labor, Field Assistance Bulletin No. 2016-1, at 5.  If a live-in caregiver works for more than five days per week, the employer must provide not only "adequate sleeping facilities'" but "private quarters in a homelike environment" for an agreement to exclude sleep time to be valid.  *Id.* at 3.

The CMWA sleep time provision is similar in material respects, except that the agreement to exclude sleep time from hours worked must be "in writing."  Conn. Gen. Stat § 31-76b(2)(D).

### 3. Discussion

Southern's arguments fall into two general categories: (1) that there was valid agreement with each Plaintiff to exclude sleep time from time worked; and (2) that Southern had no actual or constructive knowledge of sleep time interruptions experienced by any Plaintiff. The eight relevant Plaintiffs contest they had an agreement with Southern to exclude their sleep time and contend that, even if they had such an agreement, Southern knew their sleep was being interrupted and yet failed to pay them for that time spent working.

In an effort to narrow the issues for trial, the Court will address all of Southern's arguments even if they do not dispose of a Plaintiff's claims entirely. For example, as to several Plaintiffs, the Court concludes a jury must decide the question of whether Southern and that Plaintiff entered into an agreement to exclude sleep time. As to two of those Plaintiffs, however, the Court finds Southern is entitled to partial summary judgment because it did not have actual or constructive knowledge of sleep time interruptions experienced by that Plaintiff. Thus, if the jury were to conclude that either of those Plaintiffs had an agreement to exclude sleep time, such Plaintiff could not proceed further on a sleep interruption theory because there is no genuine dispute that Southern was not notified of the interruptions.

As explained below, the Court finds that genuine disputes of material fact exist as to whether Southern entered into agreements with all Plaintiffs except Plaintiff Chumakova to exclude sleep time from their pay; as to Plaintiff Chumakova, there is no genuine dispute that she agreed her sleep time would be excluded under the FLSA. This does not dispose of her FLSA claims entirely, however, as there is a genuine dispute as to whether Southern had actual or constructive knowledge of her purported sleep time interruptions and whether the agreed-to sleep period was otherwise "bona fide." *See* Sleep Periods, 4 Modern Federal Jury Instructions–Civil P

23

No. 85.15 (2023) (stating a "bona fide" sleep period also "must be regularly scheduled and must be no longer than 8 hours," "the employee must be provided reasonably adequate sleeping facilities," and "the employee must usually get at least five hours of uninterrupted sleep"). Southern also has not introduced evidence that Plaintiff Chumakova agreed to exclude sleep time in writing, as separately required under the CMWA, so her CMWA sleep time claim survives.

The Court rejects Southern's overarching argument that each Plaintiff was required to report sleep time disruptions to Southern directly to establish actual or constructive knowledge of sleep time disruptions. Because there is a genuine dispute concerning whether Southern and Nova are joint employers, it is sufficient that many Plaintiffs informed only Huliavatsenka.

But because there is no evidence that Plaintiff Fedotova and Plaintiff Semir Ahmetovic reported disruptions in sleep time to *anyone*, and no other evidence to suggest that Southern had knowledge of those plaintiffs' sleep time disruptions, Southern is entitled to a summary judgment finding as to these Plaintiffs on this basis. Plaintiff Fedotova and Plaintiff Semir Ahmetovic may continue to pursue FLSA and CMWA claims under a theory that they never agreed, as a general matter, to exclude sleep time from their pay, however.

a. Agreements to Exclude Sleep Time from Pay

The parties do not dispute that all Plaintiffs were paid by Southern in accordance with a policy that eight hours of sleep time would be excluded from pay. *See, e.g.*, Pls.' L.R. 56(a)2 St. ¶¶ 66 (admitting "Golova normally worked four live-in shifts per week for [Southern] (64 hours total) and was paid 40 hours of regular pay and 24 hours of overtime pay"), 74 (admitting "Savinova was paid 16 hours for each of [two 24-hour] shifts and paid overtime for all hours worked over 40 per week"). There is a genuine dispute over whether many Plaintiffs understood and agreed to this policy, however. Southern contends that it communicates this policy verbally,

and that it is also written on time sheets that caregivers may submit to revise their work hours. Novikava Dep., ECF No. 149-5 at 401, 114:11–115:10.

The Court finds that there is no genuine dispute Plaintiff Chumakova agreed to Southern's policy to exclude eight hours of sleep time from pay. Chumakova admitted that she "understood that SHCS would exclude eight hours of sleep time from every 24-hour shift and *agreed to that arrangement*." Pls.' L.R. 56(a)2 St. ¶ 53 (emphasis added). While Plaintiffs argue that Plaintiff Chumakova's agreement was with Nova, not Southern, they have admitted the relevant fact in their Rule 56(a)2 statement and provide no evidence that Chumakova's agreement was, in fact, with Nova.

As to all other seven Plaintiffs, there are genuine disputes as to whether there was an agreement with Southern to exclude sleep time from their pay.

### 1. *Plaintiff Sabina Ahmetovic*

Plaintiff Sabina Ahmetovic testified that she was "familiar with [the] rules when [she was] providing services for Southern Home Care Services," including that she should be given an opportunity to get eight hours' sleep, five of which were consecutive. Def.'s Ex. A to Novikava Decl., Sabina Ahmetovic Dep., ECF No. 149-4 at 15, 37:12–15. But the cited deposition testimony does not support an argument that she, conclusively, had an *agreement* with Southern to exclude sleep time. Rather, this may reflect the simple imposition of a company policy. For this reason, Southern is not entitled to a summary judgment holding that Plaintiff Sabina Ahmetovic entered into an agreement to exclude sleep time.

### 2. *Plaintiff Belavus*

Although Plaintiff Belavus admitted she "understood and agreed" to a sleep time policy, Pls' L.R. 56(a)2 St. ¶ 44, there remains a genuine dispute over whether it was as part of an

agreement with *Southern*.   Plaintiff Belavus testified that she "didn't complain [about sleep interruptions to anyone at Southern] because I didn't know I could."  Belavus Dep., ECF No. 164-2 at 58, 29:14–16.  Indeed, there is little to no evidence of Plaintiff Belavus ever interacting with anyone from Southern.   Southern cannot both argue that Southern and Nova are not joint employers, but also that Southern can benefit from a Plaintiff's interactions and potential formation of a sleep time agreement with Nova.  Because there are "disputed questions of fact as to '[e]xactly what documents and interactions even comprise[d] the parties' [purported] agreement'" with Southern, summary judgment is not appropriate as to Plaintiff Belavus on this basis.  *Modise*, 638 F. Supp. 3d at 181.

### 3.  *Plaintiff Golova*

For similar reasons, there is a genuine dispute whether Plaintiff Golova and Southern entered into an agreement to exclude sleep time.  Plaintiff Golova admitted she "understood and agreed" to the sleep time arrangement, but, unlike Plaintiff Chumakova, did not admit or testify that it was with Southern.  *See* Pls.' L.R. 56(a)2 St. ¶ 65.  Like Plaintiff Belavus, there is evidence that Plaintiff Golova never met with Southern to discuss the sleep time policy; instead, Plaintiff Golova explained that it was "Aleh" who "signed me up to work for him, and for this company Southern."  Golova Dep., ECF No. 164-2 at 143, 17:11–12.

In addition, there is a genuine dispute as to whether Plaintiff Golova was provided adequate sleeping facilities, as required as part of any agreement to exclude sleep time under 29 C.F.R. § 785.22.  Plaintiff Golova testified that she had to sleep on a regular short sofa (not a pull-out), rather than a bed, at a client's home.  Golova Dep., ECF No. 164-2 at 145, 28:2–29:4.  Southern performed site visits prior to assigning live-in caregivers to clients, which suggests that Southern

had notice of any sleeping conditions. *See* Novikava Dep., ECF No. 164-3 at 80, 59:12–21. This an additional basis to deny summary judgment as to Plaintiff Golova.

### 4. *Plaintiff Semir Ahmetovic*

Next, there is evidence that Plaintiff Semir Ahmetovic was not aware of the policy at all and thus did not implicitly agree to it with anyone. Plaintiff Semir Ahmetovic was recruited to work at Southern temporarily through his wife, Plaintiff Sabina Ahmetovic, and did not "recall ever speaking to any employees of Southern Home Care[.]" Defs.' Ex. B, Semir Ahmetovic Dep., ECF No. 149-4 at 42, 46:10–12. Although he confirmed that his wife "explain[ed] to [him] the nature of the job" and "the hours that [he] would be working in that job," he did not confirm that this included an explanation of the sleep time arrangement. *Id.* 17:14–18. There is therefore a genuine dispute whether Plaintiff Semir Ahmetovic entered into an agreement to exclude sleep time.

### 5. *Plaintiff Lukianova*

Similarly, there is no conclusive evidence that Plaintiff Lukianova entered into a sleep time agreement with Southern. Plaintiff Lukianova's testimony suggests she did not have a very high-level understanding of Southern's policies; indeed, it appears she may have been misunderstanding questions during her deposition. *See, e.g.,* Lukianova Dep., ECF No. 149-5 at 313–314, 33:1–22, 33:23–34:2 (attorney clarifying what he was and was not asking). Plaintiff Lukianova testified that she was told she would "have to sleep in the night." *Id.* 32:2–22, but that is insufficient to demonstrate that she *agreed* her sleep time would be excluded from her pay.

Like Plaintiff Golova, there is also a genuine dispute whether Plaintiff Lukianova was provided adequate sleeping facilities. *See id.* 52:18–23 (testifying that she had to sleep in the same room as her client, on a bedbug-infested and broken sofa). The Court therefore cannot find for

Southern that there is no genuine dispute Plaintiff Lukianova agreed to exclude sleep time from their pay.

### 6. *Plaintiff Fedotova*

Plaintiff Fedotova's testimony is more conflicting but still precludes summary judgment. Plaintiff Fedotova answered, "I didn't understand that at all" when asked "[w]hen did you first learn that as a live-in caregiver you would be entitled to eight hours of sleep time per night, five of which would be uninterrupted." Pls.' Ex. 13, Fedotova Dep., ECF No. 164-2 at 128, 63:9–13. But Plaintiff Fedotova had also previously testified that she knew "[b]y the documents" that each shift was 16 hours of pay and confirmed that this was "consistent with [her] understanding of how you were paid during the entire time you worked." Defs.' Ex. F, Fedotova Dep., ECF No. 149-5 at 7, 34:12–24; *see also* Pls.' L.R. 56(a)2 St. ¶ 60 (admitting that pay was consistent with her understanding of how she would be paid for live-in shifts). In light of this conflicting evidence, there remains a genuine dispute suitable for a jury's determination concerning whether Plaintiff Fedotova understood and implicitly agreed to the arrangement to exclude eight hours of sleep time from their pay.

### 7. *Plaintiff Savinova*

Last, there is conflicting evidence that similarly precludes a summary judgment finding that Plaintiff Savinova entered into an agreement to exclude sleep time. When asked if anyone had told her "you're not paid for your sleep time," Plaintiff Savinova testified "no, no one told me." Savinova Dep., ECF No. 164-3 at 129, 16:23–25. Plaintiff Savinova testified she instead was only told "my pay for the day will be $175, which I assumed including all the working conditions either I'm sleeping or not." *Id.* 17:12–15. She testified on another occasion, however, that she "understood" in 2016 that "employees' sleep time on live-in shifts must total eight hours."

Defs.' Ex. O, Savinova Dep., ECF No. 149-5 at 420, 138:6–19.  This "understanding" appears more like an employer directive that employees should log eight hours of sleep time than evidence of an agreement reached between the employer and employee.

Further, like Plaintiff Golova and Plaintiff Lukianova, there is a genuine dispute whether Savinova was provided adequate sleeping facilities.  Plaintiff Savinova stated that she slept on a folding couch, without her own room or bed.  Pls.' Ex. 36, Savinova Interrog. Resp. 6, ECF No. 164-3 at 158.  For these reasons, Southern is not entitled to a summary judgment finding as to Plaintiff Savinova on these issues.

In short, for all Plaintiffs but Plaintiff Chumakova, there are disputed questions of fact concerning whether Plaintiffs entered valid agreements with Southern to exclude sleep time.  As to Chumakova, this finding does not dispose of her FLSA claims entirely, as there remains the question of whether Southern had actual or constructive knowledge of potential sleep time interruptions, and if the sleep period was otherwise "bona fide."  The jury must also consider whether Chumakova agreed with Southern to exclude sleep time in writing, as separately required under the CMWA.

### b.  Actual or Constructive Knowledge

To narrow the issues for trial, the Court proceeds to consider Southern's argument that, even if the jury were to find there was a valid agreement to exclude sleep time, Southern did not have actual or constructive knowledge of any sleep time interruptions.  The Court finds there is no genuine dispute that Southern did not have actual or constructive knowledge of sleep time interruptions from Plaintiff Semir Ahmetovic and Plaintiff Fedotova.  There are genuine disputes of material fact as to all remaining Plaintiffs, however.

To start, "[a]n employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 287 (2d Cir. 2008).  This requirement applies equally to employees who do not work at the employer's premises. *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998) ("Work performed off-site must be counted as time worked only if the employer knows or has reason to believe that work is being performed.").

There is no strict requirement that a plaintiff lodge a formal complaint of sleep time interruptions to establish an employer's actual or constructive knowledge.  Indeed, the Second Circuit has reversed a district court for relying too heavily on the fact that a live-in caregiver plaintiff never lodged a formal complaint. *See Kuebel*, 643 F.3d at 365.  In *Kuebel*, the Second Circuit reversed a district court for relying too heavily on the fact that a live-in caregiver plaintiff never made a formal complaint; it was sufficient that the plaintiff testified that he had "specifically complained to his supervisor" on several occasions.  *Id.* at 365.  While the lack of a formal complaint could "conceivably hurt [the plaintiff's] credibility at trial," it did not warrant summary judgment. *Id.*  On the other hand, the reports must be neither vague nor conclusory.  *See Mmolawa v. Diligent Enterprises Inc.*, No. 19-cr-300 (VLB), 2020 WL 7190819, at *8 (D. Conn. Dec. 7, 2020) (granting summary judgment for employer where live-in caregiver plaintiff testimony claiming he had phoned in sleep time disruptions to the employer "daily" was "vague and conclusory," and refuted by the employer's comprehensive call records, which did not reflect any such complaints).  The Court therefore considers whether there is evidence that Plaintiffs complained to supervisors, in addition to whether they made any formal complaints. The Court finds that, even taking this more comprehensive view, there is a lack of evidence to support a

reasonable jury finding that Southern had actual or constructive knowledge of sleep time interruptions by Plaintiff Semir Ahmetovic and Plaintiff Fedotova.

When asked if she ever communicated with anyone at Nova or Southern, Plaintiff Fedotova only testified that she would call an individual named "Oleg anytime I had any questions," and that the questions concerned "every time when I start and I finish my shift."  Fedotova Dep., ECF No. 149-5 at 15, 50:13–51:5.  In response, Plaintiffs identify no evidence that Plaintiff Fedotova ever discussed sleep time disruptions with "Oleg," or anyone else, nor any evidence that "Oleg" worked for Southern and, thus, that Southern had actual or constructive knowledge of Plaintiff Fedotova's sleep time disruptions.

Similarly, Plaintiffs offer no countervailing evidence in response to deposition testimony from Plaintiff Semir Ahmetovic that he did not "recall ever speaking to any employees of Southern" apart from his wife.  Semir Ahmetovic Dep., ECF No. 149-4 at 42, 46:10–12.  There is therefore a lack of any evidence upon which a reasonable jury could find that Southern had actual or constructive knowledge of sleep time interruptions pertaining to Plaintiff Fedotova and Plaintiff Semir Ahmetovic.

To the contrary, there is evidence of a genuine dispute as to whether Southern had actual or constructive knowledge of sleep time interruptions by all six other remaining Plaintiffs.

### 1.  Plaintiff Sabina Ahmetovic

First, there is evidence that Plaintiff Sabina Ahmetovic reported sleep time disruptions to Southern, even if not in all instances.  Plaintiff Sabina Ahmetovic testified that she told Novikava an estimated "six times" that she was unable to obtain at least eight hours of sleep during a live-in shift.  Sabina Ahmetovic Dep., ECF No. 149-4 at 19, 45:11–46:3.  Plaintiff need not have reported

on every occasion nor through a formal system.  Therefore, because there is evidence that Plaintiffs Sabina Ahmetovic made direct reports to Southern, summary judgment is inappropriate.

### 2. Plaintiff Lukianova

Because there is evidence that Plaintiff Lukianova also reported sleep time interruptions to Southern, summary judgment is not warranted.   Plaintiff Lukianova reported sleep time disturbances to Southern on at least two occasions, and was compensated for those two instances. Lukianova Dep., ECF No. 149-5 at 323, 44:19–24 (confirming she was paid for two dates, but stating it was "not for all the hours").   While there are inconsistencies in Plaintiff Lukianova's testimony over whether she reported other instances, the Court finds summary judgment inappropriate absent direct evidence otherwise, like in *Mmolawa*.  Plaintiff Lukianova testified that she "reported every time [the client] would not sleep" and that that was "every day until she died." *Id.* 55:20–22.  She later testified that she called Novikava "twice," but also that she "called and told other girls that I cannot stay here anymore" maybe "five times." *Id.* 56:10–57:1.  A reasonable jury could find that Plaintiff Lukianova's other phone calls to the effect of "I cannot stay here anymore" should have provided Southern actual or constructive knowledge of other uncompensated work, even if it does "not demonstrate exactly 'how much' [additional] off-the-clock work was performed." *Kuebel*, 643 F.3d at 365.  Summary judgment is not warranted.

### 3. Plaintiff Belavus

Although there does not appear to be evidence that Plaintiff Belavus reported sleep time interruptions to Southern, there is evidence that she reported interruptions to Huliavatsenka and Nova.  Plaintiff Belavus testified that she told Huliavatsenka "she had a very difficult client who required constant attention" and that she "was not paid for all hours worked," although she did not specifically mention sleeping difficulties.  Pls.' Ex. 7, Belavus Interrog. Resp. 7, ECF No. 164-2

at 71.  Because there are genuine disputes regarding Nova's relationship with Southern, a reasonable jury may find on this evidence that Belavus's statements to Huliavatsenka provided Southern with at least constructive knowledge of sleep time interruptions experienced by Plaintiff Belavus.

### 4.  *Plaintiff Chumakova*

Similar to Plaintiff Belavus, there is evidence that Plaintiff Chumakova reported sleep time interruptions to Huliavatsenka and Nova which precludes summary judgment.  Plaintiff Chumakova testified that she did not have such conversations with anyone at Southern, but that she called Huliavatsenka and "asked him what I am supposed to do because . . . I was unable to sleep for three days."  Chumakova Dep. 86:23–87:7 (confirming she never had a conversation concerning sleep time interruptions with anyone at Southern), 15:7–17 (conversation with Huliavatsenka).  Because of the possibility of a joint employer relationship between Nova and Southern, a jury may impute any actual or constructive knowledge to Southern, based on this testimony.

The jury may also consider the evidence that Huliavatsenka discouraged Plaintiff Chumakova from reporting sleep time interruptions, as this indicates an awareness by Huliavatsenka that Chumakova may not be reporting all interruptions experienced.  *See, e.g.,* Chumakova Dep., ECF No. 164-2 at 78, 15:7–17 ("I called him and asked him what I can do or what could be possibly done in this situation, and he said be patient.").  For these reasons, Southern is not entitled to a summary judgment finding that it did not have actual or constructive knowledge of sleep time interruptions by Plaintiff Chumakova.

### 5.  *Plaintiff Golova*

Similar to Plaintiff Chumakova, there is evidence that Plaintiff Golova reported sleep time issues to Huliavatsenka and Nova and that Huliavatsenka discouraged Plaintiff Golova from reporting further interruptions.  Plaintiff Golova testified that she told Huliavatsenka she "was waking up about ten times every night to go to the bathroom" with her first client.  Golova Dep., ECF No. 164-2 at 150, 53:25–54:14.  When asked about whether she reported other interruptions, Plaintiff Golova testified"[w]hat would I complain about? They would tell me that if you don't want to work that ten people will fill in your place." *Id.* 87:4–8.  While this suggests she did not report future sleep interruptions, there is still sufficient evidence from which a reasonable jury could conclude that Southern, through Golova's reporting to Huliavatsenka, had actual or constructive knowledge of any sleep time interruptions by virtue of the possible joint employment relationship.

### 6.  *Plaintiff Savinova*

Last, there is similar evidence that Plaintiff Savinova reported sleep time interruptions to Nova and that she was discouraged from reporting any further disturbances.  Plaintiff Savinova testified that she told Huliavatsenka she would like to switch from seven to five days before "my nights are sleepless."  Savinova Dep., ECF No. 164-3 at 138, 69:3–7.  A reasonable jury could infer from this testimony that she had significant sleep disruptions (but did not yet have entirely sleepless nights).  She testified that when she complained, Huliavatsenka told her, "if you don't like something you can leave," which prevented her from making future complaints. *Id.* 66:11– 14.  For similar reasons as to the Plaintiffs who testified that they reported disturbances to Nova and were discouraged from reporting further, summary judgment is not warranted.

To summarize, Southern is entitled to judgment as a matter of law on the following issues: (1) Plaintiff Chumakova implicitly agreed to the sleep time policy; and (2) Southern lacked actual or constructive notice of sleep time disruptions by Plaintiff Semir Ahmetovic and Plaintiff Fedotova.  Because the Court does not make a finding concerning whether Plaintiff Chumakova made a written agreement (as required under the CMWA), and may nonetheless have experienced sleep time interruptions under either an implied or written agreement, Plaintiff Chumakova's sleep time claims remain live.  Similarly, because the Court has not made a finding concerning whether Plaintiff Semir Ahmetovic and Plaintiff Fedotova agreed to exclude sleep time from their pay, Plaintiff Semir Ahmetovic and Plaintiff Fedotova's sleep time claims remain live as well.

C.  Statute of Limitations

Finally, the Court considers Southern's arguments concerning the statute of limitations applicable to Plaintiffs' claims.

An opt-in plaintiff's claims under the FLSA are considered commenced when an individual plaintiff's consent to join form is filed. 29 U.S.C. § 256.  Looking backward from that date, the opt-in plaintiff is eligible to recover for unpaid overtime in the prior two years.  29 U.S.C. § 255(a). That period is extended to three years when the employer's violation of the FLSA was "willful" under 29 U.S.C. § 255(a).[6]  Similarly, courts may not award liquidated damages for violations of the FLSA or CMWA where the defendant acted "in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 U.S.C. § 260; *see also Fuk Lin Pau v. Jian Le Chen*, No. 3:14-cv-841 (JBA), 2015 WL 6386508, at *9 (D. Conn. Oct. 21, 2015) (discussing liquidated damages in the FLSA and CMWA context).

---

[6] The CMWA contains a two-year statute of limitations, which is extended to three years if the plaintiff files a complaint for failure to pay wages with the Labor Commissioner.  Conn. Gen. Stat. § 52-596.  As it is undisputed Plaintiffs have not filed such a complaint, their statute of limitations under the CMWA remains two years.

Southern contends, consistent with the argument that it did not violate the FLSA at all, there is no genuine dispute it did not violate the FLSA willfully, and so a two-year statute of limitations must apply and liquidated damages are not appropriate. The Court disagrees, and finds there remains a genuine dispute over whether Southern's conduct was willful. The Court declines to toll the statute of limitations period further, however.

Finally, the Court rejects Southern's three plaintiff-specific statute of limitations arguments. Plaintiff Semir Ahmetovic's consent form was sufficient to toll the statute of limitations as to him, and there is a genuine dispute whether Plaintiff Golova and Plaintiff Lukianova had their sleep interrupted in the three-year statute of limitations period.

### 1. Willfulness[7]

"An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "Mere negligence is insufficient." *Id.* (citing *McLaughlin*, 486 U.S. at 13). It is plaintiffs' burden to show the employer's conduct was willful, *see id.*, and the question of willfulness is generally one for the jury. *See Kuebel*, 643 F. 3d at 366; *Kinkead v. Humana at Home, Inc.*, 450 F. Supp. 3d 162, 189 (D. Conn. 2020).

On this record, a jury could reasonably conclude that Southern knew of, or showed reckless disregard with respect to, the alleged FLSA violations. First, a reasonable jury could find it was reckless for Southern to only communicate its sleep time policy verbally at the onboarding stage, and, in at least one case, to not have had an employee (Plaintiff Semir Ahmetovic) communicate

---

[7] Southern does not discuss the legal standards that apply to the FLSA or CMWA good faith defense to liquidated damages, but generally argues that the same evidence it argues supports a finding that it did not act willfully would also eliminate Plaintiffs' claims for liquidated damages. The Court therefore only considers whether there is a genuine dispute that Southern acted willfully under 29 U.S.C. § 255(a).

with any Southern staff (besides his wife) in the course of his employment.  Further, there is evidence that Plaintiffs reported sleep disruptions to Southern directly, and evidence to suggest that Southern may have been aware of additional reports made to Huliavatsenka, who allegedly discouraged the reporting of sleep time disruptions.  Although that conduct may not be attributable to Southern directly, it may evince at least a reckless disregard on Southern's part to the reality of how Connecticut live-in caregivers were managed in practice.

Although Southern made efforts to comply with the FLSA, and a jury may conclude Southern was at most negligent, it could also find that Southern acted willfully.  Southern cites to *Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999), to suggest that more evidence of willfulness is necessary, but it fails to support Southern's argument.  In *Herman*, the Second Circuit affirmed a finding of "reckless disregard" made after a bench trial when a defendant-employer "made *no effort* to ascertain [its] compliance with the FLSA" when it became aware of unlawful activity.  *Id.* at 142 (emphasis added).  First and foremost, this underscores how willfulness is typically a fact question suitable for trial.

Second, and more fundamentally, Southern overstates its efforts to comply with the FLSA. To start, it is undisputed that Southern live-in caregivers were not required to sign a clear, written agreement such as a handbook.  *See* Novikava Dep., ECF No. 164-3 at 99, 125:9–12 ("We did not enter into a written agreement. . . .").  The guidance that Southern relied on also do not concern the exact issues in this case.  For example, the 2013 DOL guidance was in response to the elimination of the FLSA's prior "domestic worker" exemption, and concerns how employers may limit employees' hours of work—it says nothing about potential joint employment liability of companies under facts similar to this case.  *See* Dep't of Labor Application of the FLSA to Domestic Service, 78 Fed. Reg. 60454 (Oct. 1, 2013) (codified at 29 C.F.R. Part 552).  Further, a

reasonable jury may find it inadequate to rely on the state access agencies' verification that every live-in caregiver should be able to sleep through the night for clients accepted into the program, when Southern has been informed to the contrary.   Accordingly, the Court denies Southern's motion for summary judgment on this issue.   *Cf. Sierra v. New England Pers. of Hartford, Inc*., No. 3:15-cv-1520 (JAM), 2017 WL 3711579, at *6 (D. Conn. Aug. 28, 2017) (denying a plaintiff's motion for summary judgment, finding that when a defendant had "relied on a lawyer's opinion from 33 years ago, as well as intermittent research in the intervening years," the failure to conduct further research "may be equally chalked up to negligence rather than willfulness").

Southern also cannot argue that Plaintiffs are simply resting on conclusory allegations in their complaint at this stage.   Southern essentially seeks to benefit retroactively from the Second Circuit's decision in *Whiteside v. Hover-Davis, Inc*., 995 F.3d 315 (2d Cir. 2021).   In *Whiteside*, the Second Circuit held plaintiffs must plead willfulness plausibly; "the mere allegation of willfulness is insufficient to allow an FLSA plaintiff to obtain the benefit of the three-year exception at the pleadings stage."   *Id.* at 323.   If this argument was available to Southern, the time has passed.

Given the evidence Plaintiff has pointed to in connection with this motion, a reasonable jury could find that Southern acted willfully.[8] Although there is evidence to support Southern's position, Southern has not pointed to evidence that conclusively shows its noncompliance—if proven—"was *not* willful or done with reckless disregard."   *Kinkead*, 450 F. Supp. 3d at 190 (emphasis in original).   The Court must view the record in the light most favorable to Plaintiffs at

---

[8] *Chang Yen Chen v. Lillis 200 W 57th Corp.*, No. 19-CV-7654 (VEC), 2023 WL 2388728 (S.D.N.Y. Mar. 7, 2023), where the plaintiff "d[id] not address willfulness in his [summary judgment] opposition brief at all," is plainly inapposite. *Id.* at *8.

the summary judgment stage.  Adopting that posture, Southern is not entitled to summary judgment

on the basis that it did not act willfully.

### 2.  *Equitable Tolling*

The Court disagrees with Plaintiffs, however, that the FLSA statute of limitations period

should be extended beyond the three-year period through equitable tolling, back to the date that

any Plaintiff began working at Southern.  Courts have equitably tolled the two- or three-year

limitation period "to avoid inequitable circumstances," *Asp v. Milardo Photography, Inc.*, 573 F.

Supp. 2d 677, 697 (D. Conn. 2008), but equitable tolling is an "extraordinary measure." *Veltri v.

Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 322 (2d Cir. 2004).  Specifically, courts equitably

toll the limitation period "'as a matter of fairness' where a plaintiff has been 'prevented in some

extraordinary way from exercising his rights, or h[as] asserted his rights in the wrong

forum.'"  *Asp*, 573 F. Supp. 2d at 697 (quoting *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24

(2d Cir. 1985)).

To that end, courts will generally equitably toll the FLSA's two- or three-year limitation

period "where the plaintiff did not consult with counsel during his employment and the employer's

failure to post [wage and hour posters in the workplace as required by 29 C.F.R. § 516.4] is not in

dispute." *Id.* at 698 (collecting cases).  That regulation requires that "[e]very employer … shall

post and keep posted a notice explaining the Act . . . in conspicuous places in every establishment

where such employees are employed so as to permit them to observe readily a copy." 29 C.F.R. §

516.4.  *See also Darowski v. Wojewoda*, No. 3:15-CV-803 (MPS), 2017 WL 6497973, at *6 (D.

Conn. Dec. 19, 2017) (citing *Veltri*, 393 F.3d at 324, for the proposition that an employer's

"undisputed failure to comply with their obligations under both the FLSA and the CMWA to post

notices in the workplace explaining Plaintiff's rights to minimum wage and overtime

compensation is an extraordinary circumstance warranting equitable tolling so long as Plaintiff otherwise lacked actual knowledge of those rights").  The CMWA requires that, in the case of domestic workers, and employer must "advise the domestic worker, in writing at the time of hiring . . . how to file a complaint for a violation of the domestic worker's rights."  Conn. Gen. Stat. § 31-71f(b)(5).

The Court is satisfied that Plaintiffs were adequately aware of their rights, such that equitable tolling on Plaintiffs' claims is inappropriate.  The parties dispute whether Southern posted notices in its offices, readily viewed by non-office staff.  In support of their argument, Plaintiffs cite to the declarations of only two Plaintiffs, one who never visited the office, and one who "visited the [Southern] office nearly every week and never saw a poster."  *See* Pls.' Ex. 24, Lukianova Decl., ECF No. 164-2 at 237, ¶ 2; Pls.' Ex. 2, Sabina Ahmetovic Decl., ECF No. 164-2 at 17, ¶ 2.  Southern responds with evidence showing it did in fact post the notices.  *See* Novikava Decl., ECF No. 149-3 at 1, ¶¶ 4-5.  On this sparse record, the Court cannot find in Plaintiffs' favor that the "extraordinary measure" of equitable tolling is warranted.  Further, although Plaintiffs note in a footnote that the CMWA requires that employers "advise the domestic worker, in writing at the time of hiring. . . how to file a complaint for a violation of the domestic worker's rights," Plaintiffs make no arguments whether or not Plaintiffs were adequately advised in writing of this requirement, so the Court deems this argument waived.  *See* ECF No. 164 at 24 n.1 (citing Conn. Gen. Stat. § 31-71f(b)).

### 3.  *Plaintiff Semir Ahmetovic*

The Court next considers Southern's plaintiff-specific arguments.   First, the Court does not find that Plaintiff Semir Ahmetovic's claims are time barred for failure to personally sign his written consent form to opt into this lawsuit.  The statute of limitations for opt-in plaintiffs in an

FLSA collective action is not automatically tolled as of the filing of the complaint; it is only tolled as of "the subsequent date on which such written consent is filed in the court in which the action was commenced." 29 U.S.C. § 256(b). Southern argues that Plaintiff Semir Ahmetovic's written consent is defective, and cannot toll the statute of limitations, because the signature on it is not his. Semir Ahmetovic Dep., ECF No. 149-4 at 26, 32:5–16. Plaintiffs offer a satisfactory explanation in the declaration from Plaintiff Semir Ahmetovic that he authorized his wife to fill out the consent form on his behalf, and it appears that the electronic signature field was prefilled with his wife's signature. Pls.' Ex. 4, Semir Ahmetovic Decl., ECF No. 164-2 at 26, ¶¶ 5–8. Absent any controlling authority otherwise, the Court finds this "written consent" sufficient to toll the statute of limitations under 29 U.S.C. § 256(b).

### 4. *Plaintiff Golova*

Southern argues that Plaintiff Golova did not identify any sleep time interruptions during the applicable limitations period, but the Court cannot conclude this is indisputably true. Plaintiff Golova testified that she "was waking up ten times every night to go to the bathroom" with her first client. Golova Dep., ECF No. 164-2 at 150, 53:25–54:14. Under *Anderson*'s burden-shifting framework, Plaintiff need only show "there is reasonable basis for calculating damages assuming that a violation has been shown," absent contrary evidence from Southern of the "precise amount of work" or evidence that "negates the reasonableness of the inference to be drawn from the employee's evidence." *Kuebel*, 643 F. 3d at 36–65 (citing *Anderson*, 328 U.S. at 687). Southern has failed to identify such evidence. The deposition testimony of Plaintiff Golova that Southern points to is inconclusive on whether the disruptions occurred exclusively with two clients before the limitations period, or that Plaintiff Golova continued to experience the sleep disruptions after; the deposition testimony simply does not contain specifics concerning such a timeline. *See* Defs.'

Ex. G, Golova Dep., ECF No. 149-5 at 22, 23:25-43.   Therefore, summary judgment is not warranted against Plaintiff Golova on this basis.

### 5. *Plaintiff Lukianova*

For similar reasons, the Court finds there is a genuine dispute whether Plaintiff Lukianova experienced sleep time interruptions during the limitations period. Plaintiff Lukianova worked periods that are both within and beyond the three- or two-year statute of limitations.  Plaintiff testified that she told staff at Southern around "five times" she "cannot stay here anymore," Lukianova Dep., ECF No. 149-5 at 220, 56:10–57:1.  Southern points to no evidence indicating that all of these occurred outside the limitations period as required by *Anderson*.

The Court declines to enter a partial summary judgment holding that Plaintiff Lukianova only had her sleep interrupted on five instances, absent conclusive evidence from Southern of this precise amount.  "Ultimately, the dispute as to the precise amount of [Plaintiff's] uncompensated work is one of fact for trial."  *Kuebel*, 643 F.3d at 364.

### D.  Conclusion

In sum, Southern's summary judgment motion is denied in nearly all respects, and has only narrowed the issues for trial at the margins.

## V.      NOVIKAVA'S MOTION FOR SUMMARY JUDGMENT

Novikava, the executive director of Connecticut's Southern operations, separately moves for a partial summary judgment that she is not an "employer" for FLSA or CMWA purposes.  The Court finds that there is a genuine dispute of material fact whether Novikava was an employer under both statutes, precluding summary judgment on this issue.

### A.  Legal Standard

As discussed in the context of joint employment, the FLSA defines "employer" broadly. *See* 29 U.S.C. § 203(d).  Employment is treated as "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."  *Barfield*, 537 F.3d 132, 141–42 (2d Cir. 2008).  When considering the FLSA liability of an *individual* within a company that itself is undisputedly a plaintiff's employer, the Second Circuit has articulated an "operational control" test and "potential power" test.  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 106–111 (2d Cir. 2013). "A person exercises *operational control* over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment." *Id.* at 110 (emphasis added).  It is not enough to simply be a high-level executive; "a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA 'employer.'"  *Id.* at 107.  "[E]vidence showing an individual's authority over management, supervision, and oversight of a company's affairs in general is relevant to the totality of the circumstances in determining the individual's operational control of the company's employment of the plaintiff employees." *Id.* (cleaned up).

It is not necessary for the defendant to exercise operational control, however; an individual may also be an "employer" for FLSA purposes if he or she had "*potential power*."  If there is no "manifestation of" an individual's operational control, "a clear delineation of an individual's

power over employees" is sufficient. *Id.* at 111. An individual may possess potential power when they "unequivocally express[ ] the right to supervise the [plaintiffs'] work, and the [plaintiffs are] well aware that they are subject to such checks as well as to regulate review of [their work]," or the individual "made decisions that affected the [plaintiffs'] work." *Id.* at 111 (internal quotation marks and citations omitted).

After the court applies the operational control or potential power test, it must then consider the four *Carter* factors. *See Velasquez v. U.S. 1 Farm Market, Inc.*, No. 3:13-cv-00634-GWC, 2016 WL 2588160 at *8 (D. Conn. May 3, 2016). The four *Carter* factors are: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12. Thes facts are not exclusive. *See Zheng*, 355 F.3d 61, 71–72 (2d Cir. 2003)). Because the question of whether a defendant is an employer under the FLSA "is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations," individual employer liability "is rarely suitable for summary judgment." *Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 356 (E.D.N.Y. 2021).

The CMWA "employs a somewhat different definition of 'employer' than the FLSA." *Tapia v. Mateo*, 96 F. Supp. 3d 1, 5 (D. Conn. 2015). The CMWA defines employer as an individual or legal entity who "employ[s] any person," Conn. Gen. Stat. § 31-71a(1), or who "act[s] directly as, or on behalf of, or in the interest of an employer in relation to employees," Conn. Gen. Stat. § 31-58(d). "In fleshing out this definition, the Connecticut Supreme Court has declined to adopt the 'economic reality test' that applies to the FLSA." *Lin v. W & D Assocs., LLC*, No. 3:14-cv-164 (VAB), 2015 WL 7428528, at *7 (D. Conn. Nov. 20, 2015) (quotation marks

omitted).  Instead, for purposes of the CMWA, the term "employer" "encompasses an individual who possesses the *ultimate authority and control* within a corporate employer to set the hours of employment and pay wages and therefore is the specific or exclusive cause of improperly failing to do so." *Butler v. Hartford Tech. Inst., Inc.*, 704 A.2d 222, 227 (Conn. 1997) (emphasis added).

### B.  Discussion

Beginning with the FLSA, there are genuine disputes of material fact concerning whether Novikava was an individual "employer" because there is evidence that Novikava exercised significant operational control over Plaintiffs.  Although Southern is headquartered in Kentucky, and assignments are determined by the Home Care for Elders Program, Novikava oversaw the entirety of Southern's Connecticut operations as executive director.  Novikava is more than a "branch manager" supervising five office employees in the Shelton, Connecticut office; she is executive director, and the head of the sole Connecticut office employing approximately 150 to 175 caregivers across the state at any given time.  Pls.' L.R. 56(a)2 St. ¶¶ 17–18.

Plaintiffs also put forth evidence that Novikava reviews reports of Plaintiffs' individual sleep interruptions, and is the ultimate authority on whether Plaintiffs will be paid for those interruptions.  *See* Novikava Dep., ECF No. 149-5 at 403, 118:3–23 (describing how, after Plaintiffs report disruptions to Southern schedulers, Novikava is given "all of this information for processing").  The determination of "employee salaries, constitute[s] 'operational control of significant aspects of the corporation's day to day functions." *Irizarry*, 722 F.3d at 108 (quoting *Doe v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 966 (6th Cir. 1991)).  The *Carter* factors, which overlap with the operational control inquiry, support this conclusion.[9]  While there is little evidence about Novikava's ability to hire or fire employees (the first *Carter* factor), Novikava's role

---

[9] Although the parties do not reference the *Carter* factors, the Court considers them under *Irizarry*.

reviewing records of sleep time disruptions and making payment decisions create a genuine dispute of material fact over whether she supervised and controlled conditions of employment (the second *Carter* factor), determined payment (the third), and maintained employment records (the fourth).

Novikava seeks to distinguish herself from individuals such as the president and chairman found to be "employers" in *Velasquez v. U.S. 1 Farm Market, Inc.*, and *Herman.* But in *Irizzary*, the Second Circuit explicitly cautioned that "a company owner, president, or stockholder" often do not possess operational control because he or she typically has "nothing to do with the hiring of the employees or fixing their wages or hours." *Id.* at 108 (quotation marks and citation omitted). Rather, it was the president and chairman's unusual involvement in the company's day-to-day operations in *Velasquez* and *Herman* that qualified them as "employers." *See Velasquez*, 2016 WL 2588160, at *9 (explaining how company president of grocery store personally hired managerial staff and posted notices outside the store that hiring); *Herman*, 172 F.3d at 140 (describing how chairman was involved in assignment of employees to work locations and instructed lower-level employees to review and revise company's employment application forms). Plaintiffs also identify several cases on the other end of the spectrum, where managers and supervisors far less senior to an executive director have still been found to be employers for FLSA purposes. *See Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 315 (S.D.N.Y. 2011) (finding general manager of a restaurant to be employer for FLSA purposes when manager was "eyes and ears" for restaurant owner); *Kim v. Kum Gang Inc.*, No. 12 Civ. 6344(MHD), 2015 WL 2222438, at *40 (S.D.N.Y. Mar. 19, 2015) (holding payroll and personnel supervisors may be employer for FLSA purposes when "handled payroll . . . and kept a close watch over the running of the Flushing restaurant")). In short, there is a genuine question as to whether Novikava was an "employer" of Plaintiffs, for purposes of the FLSA.

For similar reasons, the Court finds that there is a genuine dispute over whether Novikava may qualify as an "employer" for purposes of the CMWA.  Novikava contends that the sleep time policy was promulgated from Southern's corporate headquarters and Plaintiffs' paychecks were issued by Southern.  Pls.' L.R. 56(a)2 St., ECF No. 166-1 ¶ 4.  Southern fails to point to evidence that would conclusively establish that this means, in practice, that Novikava is not the "ultimate authority and control within a corporate employer." *Butler*, 704 A.2d at 227.  Indeed, Plaintiffs present evidence that Novikava failed to comply with the sleep time policy issued by Southern, creating a genuine issue of whether she in fact possessed the "ultimate authority" in providing compensation to Plaintiffs for sleep time disruptions.  Novikava's motion for summary judgment is therefore denied.

## VI.    CONCLUSION

For the reasons explained in this Ruling, Southern's motion for summary judgment is GRANTED IN PART and DENIED IN PART and Novikava's motion for partial summary judgment is DENIED.  Specifically, Southern's motion is granted insofar as the Court finds it is entitled to summary judgment against the eighteen Plaintiffs who only worked for Nova; that Southern entered into an implied agreement to exclude sleep time with Plaintiff Chumakova; and that it did not have actual or constructive knowledge of sleep time interruptions experienced by Plaintiff Fedotova and Plaintiff Semir Ahmetovic.  Southern's motion is denied insofar as the Court finds there are genuine disputes of material fact pertinent to Plaintiffs' joint employer theory of liability and whether Southern violated the FLSA willfully.  Novikava's motion for partial summary judgment is denied, as there are genuine issues of material fact concerning whether she was an employer for FLSA or CMWA purposes.

The Court will schedule a status conference to set dates for pretrial submissions and trial.

**SO ORDERED** at Hartford, Connecticut, this 29th day of March, 2024.


    _/s/ Sarala V. Nagala_
    SARALA V. NAGALA
    UNITED STATES DISTRICT JUDGE